**FEDERAL TRADE COMMISSION,**
**Appellant,**

v.

**WEYERHAEUSER COMPANY, et al.**

**No. 81–1346.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 26, 1981.

Decided Sept. 1, 1981.

---

Ernest A. Nagata, Deputy Asst. Director, and Michael A. Schlanger, Asst. Director, Federal Trade Commission, Washington, D.

C., with whom Howard E. Shapiro, Deputy Gen. Counsel, Federal Trade Commission, were on the brief for appellant.

James H. Sneed and David C. Shonka, Attys., Federal Trade Commission, Washington, D. C., also entered appearances for appellant.

Donald G. Kempf, Jr., Chicago, Ill., with whom Thomas D. Yannucci, Washington, D. C., was on the brief for appellees, Weyerhaeuser Co., et al.

Wayne E. Babler, Jr., Milwaukee, Wis., with whom Paul Noelke, Milwaukee, Wis., was on the brief for appellee, Menasha Corp.

Before MacKINNON, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge MIKVA.

GINSBURG, Circuit Judge:

This is an appeal from a March 25, 1981, district court order denying the application of the Federal Trade Commission (FTC) for a preliminary injunction to block a proposed merger involving Menasha Corp. and Weyerhaeuser Co. The FTC's initial review suggested that the effect of the proposed transaction might be "substantially to lessen competition in the production of corrugating medium in the West Coast region, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the [Federal Trade Commission (FTC)] Act, 15 U.S.C. § 45." Complaint at 6. Invoking Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) (1976),[1] the Commission sought to preserve

1. Section 13(b) provides in pertinent part:

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the

Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood

the status quo pending initiation and completion of administrative proceedings and any judicial review subsequent thereto.

The district court, although it determined that the Commission had established "a likelihood of success on the merits," refused to enjoin the merger. Finding that, in the particular circumstances this case presents, the public interest would be "better served by a less drastic remedy," the court ordered Weyerhaeuser to hold separate a portion of the assets acquired from Menasha. *FTC v. Weyerhaeuser Co.*, 1981–1 Trade Cas. ¶ 63,-974 (D.D.C. Mar. 25, 1981). We conclude that the manner in which the district court applied Section 13(b) to this case was consistent with the congressional design. Accordingly, we affirm the order on review.

## I. BACKGROUND

Weyerhaeuser, a publicly owned corporation, manufactures a variety of forest products. It is the largest producer of corrugated containers in the United States. Before the merger at issue here, Weyerhaeuser was the seventh largest producer of corrugating medium,[2] a component of corrugated containers, on the West Coast. Menasha, a privately held family corporation with about ninety shareholders, also manufactures wood products. Before the merger it was the third largest producer of corrugating medium on the West Coast. The merger would place Weyerhaeuser in the lead position among West Coast medium producers. 1981–1 Trade Cas. ¶ 63,974, at 76,044.

In June 1980, Weyerhaeuser and Menasha filed Premerger Notification and Report forms with the FTC. *See* 15 U.S.C. § 18a (Supp. III 1979). The reports announced Weyerhaeuser's proposed acquisition of Menasha's West Coast paperboard products assets, including a corrugating medium mill in North Bend, Oregon; an unimproved mill site one mile from the North Bend medium mill; and a cardboard container plant in Anaheim, California. In return for the West Coast assets, Menasha shareholders would receive two million shares of Weyerhaeuser stock.[3] On December 12, 1980, the FTC, seeking to halt the acquisition, commenced this action pursuant to Section 13(b) of the FTC Act. Section 13(b) authorizes the Commission to seek a preliminary injunction when it "has reason to believe" that a party is about to violate the antitrust laws and that an injunction pending resolution of the issue "would be in the interest of the public." The court "may" grant a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."

The Commission's 13(b) action challenged only Weyerhaeuser's acquisition of the North Bend corrugating medium mill. Acquisition of the unimproved mill site and the container plant stimulated no objection. Acquisition of the medium mill, the Commission contended, would eliminate Menasha as a competitor in the already concentrated West Coast corrugating medium market,[4] significantly increase concentration in that market,[5] and increase the likeli-

---

of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . .

2. Corrugating medium is a wood fiber-based material. Medium is fluted and sandwiched between sheets of linerboard, another wood fiber-based product, to form corrugated sheet. The sheet is then converted into corrugated containers, commonly known as cardboard boxes.

3. As principal steps in the transaction, Weyerhaeuser formed Weybuy, a wholly owned subsidiary, for the sole purpose of effectuating the

Menasha acquisition; Menasha transferred its remaining assets to a newly organized corporation named Menasha 1980 Corp.; Weybuy merged with the old Menasha, which retained only the company's Western paperboard products assets; the merged entity changed its name to Weyerhaeuser West Coast, Inc.

4. The Commission alleged that in 1979 the top four firms in that market accounted for 53.27% of production, the top eight firms, for 85.39%. Complaint at 5.

5. According to the Commission, the percentage of West Coast corrugating medium produced by the top four firms would rise from 53.27%

hood that West Coast corrugating medium producers would collude to raise medium prices. Complaint at 6; Plaintiff Federal Trade Commission's Proposed Findings of Fact and Conclusions of Law (hereinafter "FTC's Proposed Findings") at 21, Joint Appendix (J.A.) 841.[6]

After five days of testimony, preceded and punctuated by the submission of numerous exhibits, the district judge concluded that, although the Commission had demonstrated "a likelihood of success on the merits," the merger should not be stopped. Instead, the judge granted interim relief in the form of a hold separate order[7] pending the outcome of FTC-initiated administrative proceedings challenging Weyerhaeuser's acquisition of the North Bend medium mill.[8] *FTC v. Weyerhaeuser Co.*, 1981–1 Trade Cas. ¶ 63,974 (D.D.C. Mar. 25, 1981).

The district judge identified three equitable considerations that weighed against enjoining the merger: the merger would give Menasha shareholders a liquid asset and thus end erosion of the closely held company's capital base through forced redemption of shares; Weyerhaeuser's strong economic incentive to build a new linerboard mill on the North Bend undeveloped site, if pursued, would yield an "almost certain" increase in the supply of linerboard (a cardboard box component distinct from corrugating medium) on the West Coast and for export; construction of the linerboard mill would ease unemployment in North Bend. *Id.* at 76,047–48. (Weyerhaeuser's anticipated construction and operation of a new linerboard plant, in contrast to its acquisition of the medium mill, occasioned no FTC concern.)

In addition to these equities, the district judge further found that eventual divestiture of the North Bend corrugating medium mill would be a "feasible remedy" if the FTC ultimately succeeded in its administrative complaint, since the mill was "an integrated operation" that "would not be 'scrambled' with Weyerhaeuser's [other] assets." *Id.* at 76,048–49. Finally, the judge indicated that a hold separate order could prevent interim anticompetitive harm during the pendency of FTC proceedings by "assuring that the North Bend mill's management, supply, production, sales, and pricing decisions are insulated from Weyerhaeuser, and ... that the mill is guaranteed sufficient capital to maintain its operations and expand its capacity as demand requires." *Id.* at 76,049. Considering the equities weighing against a full stop preliminary injunction as well as the potential of a rigorous hold separate order to alleviate the Commission's concerns, the judge permitted the merger to proceed, but directed Weyerhaeuser to "cause the North Bend mill to be maintained and operated as a separate and ongoing entity in order that the mill will be capable of being divested as a viable competitor in the West Coast corrugating medium market pursuant to a subsequent order of the Federal Trade Commission." J.A. 1035B.

to 60.71%, and by the top eight firms, from 85.39% to 91.32%. Complaint at 6.

**6.** The Commission also alleged that the merger would eliminate "substantial actual competition between Weyerhaeuser and Menasha" and would "affect the availability of corrugating medium." Complaint at 6. In its Proposed Findings the Commission deemphasized the allegation of an adverse impact on medium supply, noting that it was "not essential" to the complaint. FTC's Proposed Findings at 39, J.A. 859.

**7.** A hold separate order is a form of preliminary relief which permits the challenged transaction to go forward, but requires the acquiring company to preserve the acquired company (or certain of the acquired assets) as a separate and independent entity during the course of antitrust proceedings. *See FTC v. Exxon Corp.*, 636 F.2d 1336, 1344 (D.C.Cir.1980). The aim of such an order is to maintain an acquired unit as a viable competitor while the litigation unfolds, and to safeguard "unscrambled" the assets acquired so that they may be divested effectively should the government ultimately prevail. *See United States v. Culbro Corp.*, 436 F.Supp. 746, 750 (S.D.N.Y.1977).

**8.** The FTC issued an administrative complaint against Weyerhaeuser on February 18, 1981. The administrative complaint charges the same anticompetitive effects earlier alleged in the Commission's complaint for a preliminary injunction. Complaint at 4, *In re Weyerhaeuser Co.*, Docket No. 9150 (FTC complaint issued Feb. 18, 1981), J.A. 810A.

The FTC immediately asked the district judge to stay the merger pending appeal, or for thirty days, or even for seventy-two hours to permit the Commission to seek an injunction from this court pending appeal. The judge denied these requests as well as a final Commission plea to stay the merger until the following morning. He rejected the plea for an overnight stay despite FTC representations that, absent a holding order, Weyerhaeuser and Menasha might consummate the merger before the Commission could apply to the court of appeals for emergency relief. J.A. 1063–64.

On the evening of March 25, 1981, less than three hours after the district court had refused to grant any restraint against the merger, the FTC filed in this court an emergency motion for an injunction pending appeal. Approximately seventy minutes later this court granted a temporary stay. Before the FTC had even filed its emergency motion, however, Weyerhaeuser and Menasha had consummated the merger.

On April 7, 1981, a motions panel of this court granted the FTC's motion for an injunction pending appeal. *FTC v. Weyerhaeuser Co.*, 648 F.2d 739 (D.C.Cir.1981). The Commission emphasized then, as it does now, that preliminary injunctions rather than hold separate orders had issued in every known horizontal merger case in which the government sought injunctive relief, demonstrating both (1) a likelihood of ultimate success, and (2) the prospect of interim anticompetitive harm in the absence of any restraint. *See* Brief of Appellant at 54. Finding that the FTC had met the standards of *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.

Cir.1958),[9] for an injunction pending appeal and that the companies "acted at their peril in completing the act that the FTC sought to enjoin," 648 F.2d at 742,[10] the motions panel directed the parties "to return to the *status quo* existing at the time when the motion for injunctive relief was denied in the District Court." *Id.* The panel explained that its direction to undo the merger was designed to preserve this court's ability to review in full on the merits the district court's denial of the FTC's request for a preliminary injunction. An order of that preservative genre may be issued, the panel noted, even " 'without considering the ultimate rights of the parties in the controversy.' " *Id.* (quoting *Ramsburg v. American Investment Co.*, 231 F.2d 333, 337 (7th Cir. 1956)).[11]

Although the motions panel thus ordered the merger undone, the parties have not accomplished the dissolution. On April 17, 1981, Weyerhaeuser submitted a proposed implementing order that would declare the merger void *ab initio*. We deferred consideration of that suggestion pending additional submissions by the parties addressed to the issue.

The appropriate method of undoing the merger has become an academic question in view of our affirmance of the district court's order. Nonetheless, we pause to comment on the extraordinary situation our motions panel confronted. It was not consistent with the fair, effective administration of justice for the district judge to deny to a party, situated as was the FTC in this case, even a brief holding order affording time to apply to this court for provisional relief.

---

**9.** *Virginia Petroleum Jobbers* requires the applicant for an injunction pending appeal to make "a strong showing that it is likely to prevail on the merits of its appeal." 259 F.2d at 925. The motions panel found that the FTC satisfied that stringent criterion. 648 F.2d at 741. Winning this set, however, does not take the match. After full briefing and oral argument, and review of the record, a merits panel may determine, as in this case, that the district court's order, although it resolves novel or difficult issues, reflects no reversible legal error or abuse of discretion.

**10.** As the motions panel noted, an officer of this court informed counsel for Weyerhaeuser that the FTC, upon filing papers, would seek an immediate administrative stay. 648 F.2d at 741–42.

**11.** Judge MacKinnon dissented from the motions panel order. He stated that the FTC had "shown at most a likelihood of ultimate success on its Section 7 [of the Clayton Act] claim," a showing he deemed "insufficient to warrant the extraordinary relief of an injunction pending its appeal." 648 F.2d at 744.

## II.  MOOTNESS

Before turning to the merits of the Commission's appeal, we respond to the argument, still pressed by Menasha and Weyerhaeuser, that consummation of the merger when no restraining order was outstanding removed the district court's ruling from this court's scrutiny.  We concur in the motions panel's view of this issue.  648 F.2d at 741–42.  Since all participants in the merger are parties to the action, this tribunal is not bereft of authority to command return to the status quo ante.

The FTC instituted this action against Weyerhaeuser and Weybuy.  Less than a month after the action commenced, Menasha sought and obtained leave to intervene as a party defendant.  Both Menasha and Weyerhaeuser filed briefs as appellees and presented oral argument on appeal.  This is not a case in which the absence of a party to the transaction at issue disarms the court from granting effective relief.  *Cf., e.g., In re Combined Metals Reduction Co.*, 557 F.2d 179 (9th Cir. 1977) (after district court decision, trustee in bankruptcy disposed of property; appeal was moot since purchasers and other interested parties were not before court); *Fink v. Continental Foundry & Machinery Co.*, 240 F.2d 369 (7th Cir.) (shareholders of Continental sued to prevent company from selling assets; officers sold assets pending appeal; claim was moot because purchasers were not before court), *cert. denied*, 354 U.S. 938, 77 S.Ct. 1401, 1 L.Ed. 1538 (1957); *Sobel v. Whittier Corp.*, 195 F.2d 361 (6th Cir. 1952) (shareholder of Whittier Corp. sued to restrain merger of Whittier with Detroit Housing Corp.; companies merged pending appeal; claim was moot because Detroit Housing Corp. had never been made a party and court could not order effective relief in its absence);

*Shaw v. Lane*, 47 App.D.C. 170 (1917) (suit to enjoin Secretary of Interior from delivering mineral leases; leases were delivered pending appeal; case was moot since lessees were not before the court), *appeal dismissed sub nom. Shaw v. Payne*, 254 U.S. 609, 41 S.Ct. 60, 65 L.Ed. 436 (1920).  Rather, all parties necessary to effective review and disposition of the controversy are represented in this court as they were in the district court.[12]  We therefore follow the precedent relevant in these circumstances.  *See, e.g., Industrial Bank of Washington v. Tobriner*, 405 F.2d 1321 (D.C.Cir.1968) (bank sued to enjoin D.C. Commissioners from issuing tax deed to one Scheve; Commissioners issued deed pending appeal; case was not moot since both Commissioners and Scheve were parties); *Bastian v. Lakefront Realty Corp.*, 581 F.2d 685 (7th Cir. 1978) (shareholder of Lakefront Realty Corp. sued to enjoin sale of property to Northwestern University; sale completed pending appeal; case was not moot because both Lakefront and Northwestern were before the court); *Ramsburg v. American Investment Co.*, 231 F.2d 333 (7th Cir. 1956) (shareholders of Domestic Finance Corp. sought to enjoin merger with American Investment Co.; companies merged pending appeal; case was not moot since both companies were parties).

Again, we note that the suggestion of mootness was made possible only by the district court's resistance to a holding order of any kind.  A temporary restraint pending an application to this court would have provided the breathing space warranted under the circumstances without implying that the district judge was insecure about the judgment he had made.  *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843,

---

**12.**  Menasha's shareholders were apprised of the FTC's pending challenges when they voted to approve the merger.  Our attention has not been directed to any divergence of interest between the privately held family corporation and its shareholders.  Menasha stressed in the district court the interests of its shareholders in accomplishing the merger, thereby acquiring Weyerhaeuser shares in exchange for Menasha shares.  Correspondingly, on appeal, Menasha pressed the interests of the shareholders in retaining the Weyerhaeuser stock.  In light of the apparent coincidence of interest between Menasha and its shareholders, we are unpersuaded by Menasha's argument that, at this juncture, the shareholders should rank as indispensable parties whose absence requires dismissal of the appeal.

844–45 (D.C.Cir.1977) (district court may "grant a stay even though its own approach may be contrary to movant's view of the merits"; "tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained"); *cf. FTC v. National Tea Co.*, 603 F.2d 694 (8th Cir. 1979) (although district court denied, and court of appeals upheld denial of, FTC request for an injunction, court of appeals enjoined merger for ten additional days to afford Commission an opportunity to seek relief from Supreme Court).

### III. THE MERITS

On the facts as well as the law, the FTC contends that clear error infects the district court's order. The Commission assails particularly the finding below, as "one of the equities," that pursuit of Weyerhaeuser's plan to construct a new linerboard mill would yield an "almost certain" increase in the supply of that product. As to the governing law, the FTC charges no mere misapplication of Section 13(b), but a refusal to apply the statute. According to the Commission, when, as in this case, the FTC demonstrates a likelihood of success, and the court acknowledges the prospect of interim anticompetitive harm if provisional relief is not granted, then, almost without exception, a preliminary injunction must issue. We deal first with the Commission's assault on the district court's determination relating to Weyerhaeuser's plans to construct a linerboard mill, next with the governing legal standard, and finally with the application of that standard to the congeries of circumstances this case presents.

#### A. *Challenged Fact Findings.*

The fact findings challenged by the FTC bear significantly on the district court's decision to order safeguards stopping short of a preliminary injunction. We therefore indicate in some detail why we disagree with the Commission's view that the findings should be set aside as "clearly erroneous." *See* Fed.R.Civ.P. 52(a).

Consummation of the acquisition, the district court stated, would result in "the almost certain increase of linerboard supply through construction of a new liner mill at Menasha's undeveloped mill site." 1981–1 Trade Cas. ¶ 63,974, at 76,047. This new construction would "(1) increas[e] linerboard supply on the West Coast, and for export; and (2) increas[e] employment in the North Bend area." *Id.* at 76,048. The FTC attacks these findings as resting on nothing more solid than Weyerhaeuser's "purely self-serving speculation." Brief of Appellant at 28. We find more substantial support for the findings in the record.

Weyerhaeuser's vice president in charge of the paperboard and packaging division, John H. Waechter, testified that his company "very definitely" planned to construct a linerboard mill at the vacant site. J.A. 337. That construction, he said, "was one of the prime considerations" for the Menasha acquisition. J.A. 338. Indeed, the FTC stated in its Proposed Findings (90 n.2, 98 n.1) that "Weyerhaeuser's initial interest focused on the [undeveloped] mill site," J.A. 863, that "[s]uch mill sites are scarce," and that "there are no other known comparable mill sites in the West Coast region." J.A. 867. These undisputed realities, we believe, contradict the dissenting opinion's repeated references to "the piece of vacant land" as a pretext, a "creative use of boot," a tacked on "appurtenance." *See* Dissent at 1094, 1095, 1096.

Waechter had discussed the new mill with the board of directors when he presented the proposed merger to them. J.A. 392. He looked toward commencement of construction in 1986 or earlier, although he was unable currently to supply an estimate of the starting time. J.A. 353, 392. Weyerhaeuser was not likely to encounter antitrust objections with respect to its construction and operation of the linerboard plant. *See* FTC's Proposed Findings 98, J.A. 867. Waechter believed the company would build the plant even if it were ordered, as a result of the FTC's administrative complaint, to divest the one Menasha asset the Commission maintains Weyerhaeuser should not ac-

quire—the North Bend corrugating medium mill. J.A. 338.

Two internal Weyerhaeuser documents supported Waechter's testimony. The company's report to its board of directors on the proposed merger calls attention to the "potential linerboard site." J.A. 1207. And a confidential interoffice communication, introduced into evidence by the FTC, indicates that by January 1980 Weyerhaeuser had commenced preparatory work on the project. Weyerhaeuser officials had contacted Oregon's Department of Ecology concerning environmental aspects of the mill's construction and operation and had inquired about the supply of water. J.A. 1208.

Third parties supplied relevant statements. Two testified in court, others submitted affidavits. William E. Smith, Mayor of North Bend, testified at the hearing and confirmed that Weyerhaeuser had checked with local authorities about the availability of water to run the mill. J.A. 315. He expressed his confidence, and that of the community, based on past "good experience" with Weyerhaeuser, that the mill site would be developed "if Weyerhaeuser had it." J.A. 316. *See also* J.A. 314.[13] The group vice president of an independent corrugated container manufacturer also testified to his expectation that Weyerhaeuser would construct the linerboard plant and expand supply of linerboard. J.A. 207–08, 212–13 (testimony of Richard Brundage).

There was abundant testimony that if Weyerhaeuser did construct the mill, it would alleviate unemployment in North Bend,[14] increase domestic supplies of linerboard,[15] and produce some linerboard for export.[16] The FTC did not seriously dispute

**13.** By affidavit, other North Bend area civic leaders indicated that they believed Weyerhaeuser had the incentive and ability to build the new mill. Affidavit of Jack L. Beebe (Coos County Commissioner) at 3, J.A. 1512 (Weyerhaeuser likely to keep a new mill open; it kept mills open when others shut down during recession); Affidavit of Norman Douglas Mills (vice president and manager of a Coos Bay bank) at 2, J.A. 1515 (because of Weyerhaeuser's involvement in the international market, it continues to operate mills even when domestic producers shut down).

**14.** *See, e.g.*, J.A. 313 (testimony of Mayor Smith) (North Bend has been "listed as one of the ten areas in the state that are in real tough financial and real tough economic [straits]"); J.A. 314 (testimony of Mayor Smith) (proposed merger is a "breath of fresh air" because it provides a possibility of new jobs); Affidavit of Jack L. Beebe (Coos County Commissioner) at 2, J.A. 1511 (unemployment in Coos County is over two times the national average; "Weyerhaeuser's construction of a new mill would make a major contribution to solving that problem"); Affidavit of Norman Douglas Mills (vice president and manager of local bank) at 2, J.A. 1515 (construction of new mill "would constitute a major infusion of money into the economy through the creation of immediate construction jobs and then hundreds of mill jobs for unemployed workers"); Affidavit of Richard Cosgrove (publisher of local newspaper) at 2, J.A. 1519 (development of mill site "would provide sorely needed mill jobs, other commercial activity in the service and retail segments of the economy, and the resulting added tax revenues" and "would also serve as an impetus to other companies to construct compatible deep-water moorage for cargo-carrying freighters, thus creating additional jobs and tax revenues").

**15.** Richard Brundage, group vice president of an independent corrugated container manufacturer, testified that he was concerned about the availability of linerboard and had therefore entered into long-term contracts for the commodity. J.A. 213. Paul H. Vishny, general counsel to the Association of Independent Corrugated Converters, agreed that the availability of linerboard is of even more concern to independent box manufacturers than the availability of corrugating medium. He believed that Weyerhaeuser's construction of a new linerboard mill would be especially beneficial since he understood that Weyerhaeuser already was a net seller of linerboard. J.A. 405. John H. Waechter, a Weyerhaeuser vice president, confirmed that linerboard produced at the new mill would feed the open market rather than Weyerhaeuser's own box plants. J.A. 339.

**16.** Weyerhaeuser vice president John H. Waechter testified that both the domestic and foreign markets for linerboard were viable, J.A. 339, and that Weyerhaeuser has an extensive international marketing effort. J.A. 361 (testimony on cross-examination). And Thomas Williscroft, general manager of the North Bend medium mill, testified that the nearby mill site is a particularly attractive one since it adjoins an oceangoing deep water channel and has export possibilities. J.A. 184–85 (testimony on cross-examination). *See also* Affidavit of Norman Douglas Mills (vice president and manager

this testimony. The Commission's expert witness stated that "[a]ll other factors constant," an increase in linerboard production would be procompetitive. J.A. 501 (cross-examination of Walter J. Mead). The FTC's Reply to Defendants' Prehearing Memorandum acknowledged that if Weyerhaeuser acquired only the undeveloped mill site, and if its representations were genuine, it "could improve employment prospects to Coos Bay residents; increase the supply of linerboard; [and] protect the environment." J.A. 40B. The FTC did insist that construction of the linerboard mill was an independent matter that should not be compounded with, and did not justify, acquisition of the corrugating medium mill.[17] However, the Commission recognized that construction of the former facility would produce important benefits.

Weyerhaeuser is not legally bound to develop the mill site, and the district court so stated. 1981–1 Trade Cas. ¶ 63,974, at 76,048. However, Weyerhaeuser's assertion of a fixed intention to build and operate a linerboard plant at the site is supported by live testimony of a high-ranking officer, company documents, prehearing action taken by the company, third party testimony, and the FTC's own Proposed Findings (90 n.2, 98 n.1, J.A. 863, 867). Hearings on preliminary injunctions necessarily look to the future and decisions must rest on comparative, tentative assessments of the course of events if the injunction is issued, and if it is not. We cannot conclude from the evidence we have reviewed that the district judge, who heard and evaluated the testimony first hand,[18] clearly erred when he determined that, absent a preliminary injunction, Weyerhaeuser would proceed to complete and implement plans for the construction and operation of a linerboard plant at North Bend.

## B. The Statutory Standard.

As noted earlier, Section 13(b) conditions issuance of a temporary restraining order or a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in

---

of local bank) at 2, J.A. 1515 ("Weyerhaeuser has demonstrated an unusual faculty for developing export markets for its products"); Affidavit of Richard Cosgrove (publisher of local newspaper) at 2, J.A. 1519 (development of mill site would prompt other companies to "construct compatible deep-water moorage for cargo-carrying freighters").

17. The Commission argues that the beneficial effects flowing from construction of a linerboard mill at North Bend could have been achieved without Weyerhaeuser's acquisition of the North Bend medium mill—Menasha could have sold Weyerhaeuser only the undeveloped mill site or Menasha could have developed the site itself. The FTC concedes, however, that Weyerhaeuser's initial interest was sparked by the vacant mill site (FTC's Proposed Findings 90 n.2, 98 n.1, J.A. 863, 867), and the district judge heard testimony that Menasha would neither sell the site without the other assets nor develop the site on its own. J.A. 263, 284 (testimony of Richard Johnson, chairman of Menasha's board of directors); J.A. 297–98 (cross-examination of Johnson); J.A. 175 (testimony of Thomas Williscroft, general manager of North Bend mill).

18. We reject the FTC's argument that, because the district judge refused to credit Weyerhaeuser's claims that it would expand production at the North Bend corrugating medium mill in a procompetitive way, 1981–1 Trade Cas. ¶ 63,974, at 76,046, he acted capriciously in finding that Weyerhaeuser intended to build a new linerboard mill. The testimony regarding the two expansions differed. In particular, there was evidence that Menasha had recently made numerous improvements at the North Bend medium mill. J.A. 181–82 (cross-examination of Thomas Williscroft, general manager of the North Bend medium mill). The district judge might have concluded either that additional improvements to the mill were not indicated or that, if improvements were necessary, Menasha, if it stayed in the paperboard products business on the West Coast, would make them. *But see* J.A. 261 (testimony of Richard Johnson, chairman of Menasha's board of directors, that Menasha would not further improve the mill). By contrast, the FTC itself urged the judge to note that "Weyerhaeuser's interest in the [undeveloped] mill site pre-date[d] its interest in the North Bend [medium] mill." The Commission further pointed to the scarcity of such sites. FTC's Proposed Findings 98 n.1, J.A. 867. In his zeal to recast the undeveloped mill site as an afterthought to make weight, our dissenting colleague turns a blind eye to these Commission-acknowledged factors. *See* Dissent at 1094, 1095, 1096.

the public interest." [19] The FTC maintains that the district judge defined "the equities" in a manner incompatible with the purpose of 13(b) and that, despite his recognition that the FTC had established a claim for relief, he displaced the only remedy specified in 13(b), a preliminary injunction, and substituted for it an interim arrangement (the hold separate order) of his own invention. We treat in turn each of the charges that the district judge acted in opposition to the directions set for him by Congress.

### 1. The Equities.

The Commission urges that there is no equity to weigh here other than the one it advances—the public interest in effective antitrust enforcement. Once the Commission shows a likelihood of ultimate success and a prospect of interim harm if a merger goes unchecked, then, according to the FTC, a preliminary injunction barring the acquisition should issue without further ado. Our reading of the statute and its legislative history does not accord with the Commission's. We find that Congress had in view equities other than antitrust enforcement and a role for the court less mechanical than the one the FTC describes.

Section 13(b) was initiated by a Senate floor amendment to the proposed Federal Lands Right-of-Way Act of 1973.[20] As originally composed, the provision did not include the phrase "weighing the equities and considering the Commission's likelihood of ultimate success." 119 Cong.Rec. 22978–79 (1973) (text of floor amendment). That language was added in Conference. H.R. Rep.No. 624, 93d Cong., 1st Sess. 18 (1973); U.S.Code Cong. & Admin.News 1973, p.

2417. We do not believe the deliberate addition of a reference to "the equities" should be brushed aside as essentially repetitive or meaningless.

The Conference Report provides an explanation of the derivation and purpose of 13(b). In its entirety, the Report's discussion of 13(b) reads:

[The Section] relates to the standard of proof to be met by the Federal Trade Commission for the issuance of a temporary restraining order or a preliminary injunction. It is not intended in any way to impose a totally new standard of proof different from that which is now required of the Commission. The intent is to maintain the statutory or "public interest" standard which is now applicable, and *not* to impose the traditional "equity" standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner. This latter standard derives from common law and is appropriate for litigation between private parties. It is not, however, appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need for injunctive relief.

The inclusion of this new language is to define the duty of the courts to exercise independent judgment on the propriety of issuance of a temporary restraining order or a preliminary injunction. This new language is intended to codify the decisional law of Federal Trade Commission v. National Health Aids, D.C., 108 F.Supp. 340 and Federal Trade Commission v. Sterling Drug, Inc., [2d Cir.] 317 F.2d 669, and similar cases which have

---

**19.** The relevant portion of the text of Section 13(b) is set out in note 1 *supra*.

**20.** S. 1081, 93d Cong., 1st Sess., *enacted as* Act of Nov. 16, 1973, Pub.L.No.93–153, § 408(f), 87 Stat. 592.

Prior to the enactment of Section 13(b), the FTC was not explicitly authorized to seek preliminary relief of the kind requested here. Under the All Writs Act, 28 U.S.C. § 1651(a), however, the Commission achieved interim relief blocking a merger upon establishing to a

court of appeals "that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." *FTC v. Dean Foods Co.,* 384 U.S. 597, 605, 86 S.Ct. 1738, 1743, 16 L.Ed.2d 802 (1966). Section 13(b) eliminates the need for the FTC resort to the All Writs Act by conferring authority upon the district courts to hear the Commission's requests for preliminary restraints.

defined the judicial role to include the exercise of such independent judgment. The Conferees did not intend, nor do they consider it appropriate, to burden the Commission with the requirements imposed by the traditional equity standard which the common law applies to private litigants.

*Id.* at 31, U.S.Code Cong. & Admin.News 1973, p. 2533 (emphasis in original).

As the second paragraph of the Conference Report discussion highlights, Section 13(b) was not designed to innovate. Rather, Congress "intended to codify the decisional law." The courts had evolved an approach to cases in which government agencies, acting to enforce a federal statute, sought interim relief. The agency, in such cases, was not held to the high thresholds applicable where private parties seek interim restraining orders.[21] Most importantly, the case law lightened the agency's burden by eliminating the need to show irreparable harm.[22]

In addition to emphasizing the lighter burden placed on the agency, however, the Conference Report underscores another point—the judgmental role envisioned for the courts. The case law Congress codified removes irreparable damage as an essential element of the preliminary injunction proponent's case and permits the judge to presume from a likelihood of success showing that the public interest will be served by interim relief.[23] However, the judge remains obligated "to exercise independent judgment on the propriety of issuance of a temporary restraining order or a preliminary injunction." H.R.Rep.No.624, at 31, U.S.Code Cong. & Admin.News 1973, p. 2533. Independent judgment is not exercised when a court responds automatically to the agency's threshold showings. To exercise such judgment, the court must take genuine account of "the equities."

The district court weighed both private and public equities in reaching its determination. In the former category, the court considered the interest of Menasha shareholders in realizing the value of their stock and the advantage to Menasha of continued operations on a more centralized basis. As public equities, the court counted the potential increase in linerboard supply on the West Coast and for export, and the development of employment opportunities in the North Bend area.

The FTC asserts that the fortunes of Menasha Corp. and its shareholders merit no or, at most, minimal weight. And the advantages forecast for the North Bend economy and the linerboard market, the Commission argues, are irrelevant since these benefits would not supply a defense to the pending charge of anticompetitive effects in the corrugating medium market. We conclude that private equities merit consideration,[24] although, standing alone, they do not override an FTC likelihood of success showing. We reject the FTC's argument that public benefits do not count unless they relate to the relevant market, here, corrugating medium, and could form part of the defense to the Commission's antitrust complaint.

---

**21.** *See, e. g., Dendy v. Washington Hosp. Center,* 581 F.2d 990, 992 (D.C.Cir.1978) (citing *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921 (D.C.Cir.1958)); *Riggs Nat'l Bank v. Allbritton,* 516 F.Supp. 164, 170 (D.D.C.1981) (ordinarily applicable prerequisites to preliminary injunction are irreparable harm, probability of success on the merits, balance of equities favoring plaintiff, public interest served by provisional relief).

**22.** *See, e. g., United States v. Hayes Int'l Corp.,* 415 F.2d 1038, 1045 (5th Cir. 1969) (employment discrimination in violation of civil rights laws); *SEC v. Globus Int'l, Ltd.,* 320 F.Supp. 158, 160 (S.D.N.Y.1970) (stock manipulation in violation of securities laws); *United States v. Ingersoll-Rand Co.,* 218 F.Supp. 530, 544–45 (W.D.Pa.) (merger in violation of antitrust laws), *aff'd,* 320 F.2d 509 (3d Cir. 1963).

**23.** *See, e. g., United States v. Pennzoil Co.,* 252 F.Supp. 962, 986–87 (W.D.Pa.1965); *United States v. Chrysler Corp.,* 232 F.Supp. 651, 657 (D.N.J.1964).

**24.** *See, e. g., United States v. Atlantic Richfield Co.,* 297 F.Supp. 1061, 1073 (S.D.N.Y.1969), *aff'd mem. sub nom. Bartlett v. United States,* 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971); *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543, 569 (N.D.Ill.1968); *United States v. Brown Shoe Co.,* 1956 Trade Cas. ¶ 68,244, at 71,116 (E.D.Mo.1956).

As to private equities, we note that the statutory reference to "the equities" is not qualified. Prior to the enactment of Section 13(b), courts weighed private equities in the balance in cases in which preliminary injunctive relief was sought to restrain an alleged statutory violation.[25] Since Congress intended to codify that case law, we have no warrant to drop private equities from the calculus.[26] However, we agree with the Commission to this extent. Private equities do not outweigh effective enforcement of the antitrust laws. When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger.[27] We hold only that a district court does not err when it considers private equities weighing against a total stop order in conjunction with public equities that also support less drastic interim relief.

The public equities involved here, projected procompetitive benefits from construction of a new linerboard mill, with attendant improvement in the area employment rate, would not qualify as defenses to the charged violation of Section 7 of the Clayton Act, the FTC maintains. As the Commission puts it, "[a] merger which may lessen competition is not saved because, 'on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial.'" Brief of Appellant at 62–63 (quoting *United States v. Philadelphia National Bank*, 374 U.S. 321, 371, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915 (1963)). But the district court's reckoning in a 13(b) proceeding is tentative. The determination of a likelihood of success must be made under time pressure and on incomplete evidence. The risk of an erroneous assessment is therefore higher than it is after a full evidentiary presentation. Accordingly, it is permissible for the court to weigh among "the equities" the potential benefits, public and private, that may be lost by a merger-blocking preliminary injunction, whether or not those benefits could be asserted defensively in a proceeding for permanent relief. We do not believe that the district court, mindful that its "likelihood of success" evaluation is only a forecast, should be precluded from taking into account the costs entailed should its prediction prove erroneous.

2. *Relief Pursuant to Section 13(b) Short of a Full Stop Order: The Hold Separate Order.*

a. Authority to issue a hold separate order.

According to the FTC, Section 13(b) presents the courts with an all or nothing choice. The FTC argues that 13(b) authorizes a preliminary injunction blocking a merger *in toto*, but no relief short of a full restraint. A less drastic measure, such as a hold separate order, does not bear congressional approval, the FTC maintains, and can be justified, if at all, only as an exercise of the court's "inherent equity powers." Although embraced by our dissenting colleague (*see* Dissent at 1091–92, 1093, 1095–

---

25. *See, e. g.*, decisions cited in note 24 *supra*.

26. *But cf. FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345–46 (4th Cir. 1976) (opinion of Winter, J.); *FTC v. Rhinechem Corp.*, 459 F.Supp. 785, 791 (N.D.Ill.1978); *FTC v. Lancaster Colony Corp.*, 434 F.Supp. 1088, 1097 (S.D.N.Y.1977) (supporting FTC's position that private interests served by a merger deserve scant weight in 13(b) proceedings).

We do not rank as a private equity meriting weight a mere expectation of private gain from a transaction the FTC has shown is likely to violate the antitrust laws. And we would differentiate the case of an entire transaction vulnerable to legal challenge from one in which only part of the transaction is suspect. *Compare Gulf & Western Indus., Inc. v. Great At-* lantic & Pacific Tea Co., 476 F.2d 687, 698 (2d Cir. 1973), *with* Findings of Fact and Conclusions of Law 58–65, 1981–1 Trade Cas. ¶ 63,-974, at 76,047–48.

27. *See United States v. Atlantic Richfield Co.*, supra note 24, 297 F.Supp. at 1073–74; *United States v. Ingersoll-Rand Co.*, supra note 22, 218 F.Supp. at 543; *FTC v. Weyerhaeuser Co.*, 648 F.2d 739, 741 (D.C.Cir.1981) ("While we agree that private equities may be considered in a motion for injunctive relief, we do not believe that those equities may be given *conclusive effect* at the nearly complete expense of the public interest also present.") (emphasis in original).

96), we find scant sense in this distinction, nor is it moored to the words of the statute or its legislative history.

When Congress enacted Section 13(b) in 1973, the hold separate order was an established device in antitrust law enforcement. Indeed, the first reported government effort to enjoin a merger under the Clayton Act resulted in a hold separate order. *United States v. Brown Shoe Co.*, 1956 Trade Cas. ¶ 68,244 (E.D.Mo.1956). *See also FTC v. PepsiCo, Inc.*, 477 F.2d 24 (2d Cir. 1973); *United States v. G. Heileman Brewing Co.*, 345 F.Supp. 117 (E.D.Mich.1972); *United States v. International Telephone & Telegraph Corp.*, 306 F.Supp. 766 (D.Conn. 1969), *appeal dismissed*, 404 U.S. 801, 92 S.Ct. 20, 30 L.Ed.2d 34 (1971). Section 13(b) confirms the equity power courts exercised prior to its enactment to grant interim relief in aid of the FTC's law enforcement authority. Congress expressed a plain purpose to codify decisional law, not to straitjacket it, and to recognize "the duty of the courts to exercise independent judgment." *See* pp. 1081–82 *supra.*

We emphasize that 13(b) does not "mandate" remedial rigidity. *Cf.* Dissent at 1091, 1095. Principally, it posts a clear entrance sign for FTC provisional relief applications by eliminating the need for the Commission to resort to the All Writs Act. *See* note 20 *supra.* Further, it speaks of relief the court "may" (not shall) grant.

Significantly, legislative proposals explicitly authorizing FTC provisional relief applications initially focused on consumer protection cases, not mergers threatening antitrust violations. *See* S. 986, 92d Cong., 1st Sess. (1971); S. 3065, 90th Cong., 2d Sess. (1968). The expanded authorization in 13(b) encompassing "any provision of law enforced by the Federal Trade Commission" was introduced by Senate floor amendment.

*See* note 20 and accompanying text *supra.* Apparently sparked by the FTC General Counsel's request to Senator Jackson, *see* 119 Cong.Rec. 22979 (1973), the enlarged scope of the authorization was not specifically discussed in any committee report or floor debate. We therefore believe our dissenting colleague is misguided in assuming that Congress wanted only full stop orders, temporary or preliminary, and no less drastic restraint, as a 13(b) remedy. *See* Dissent at note 5 and accompanying text. A wide range of offenses mark the areas (unfair methods of competition, unfair or deceptive acts or practices) that first attracted congressional concern to arm the FTC with clear authority to seek interim relief. *See* 15 U.S.C. § 53(a). We therefore think it most logical to assume that Congress anticipated the courts would mold decrees "to the necessities of the particular case," with the "[f]lexibility rather than rigidity" that has distinguished "[t]he historic injunctive process." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944).

■ In sum, neither we nor our dissenting colleague can confidently assert based on the wording or the genesis of 13(b) that Congress, when it enacted the provision, adverted specifically to a hold separate order. We believe, however, that we are on secure ground in recognizing that "[w]e are dealing here with the requirements of equity practice with a background of several hundred years of history." *Id.* "The historic injunctive process," *id.*, entails decrees adjusted to fit the practical situation the case presents, not wooden, mandatory rulings. A hold separate order is in form and effect a preliminary restraint, albeit less drastic than a full stop order.[28] Such an order, we conclude, is not outside the range of relief a 13(b) application may warrant.

---

**28.** If Congress meant to allow the hold separate order as 13(b) relief, the dissenting opinion asserts, it would have added after "temporary restraining order" and "preliminary injunction" "or other order," as it has done in other legislation, for example, the Emergency Price Control Act of 1942. Dissent at note 3. It suffices to point out that the Supreme Court considered the term "other order" in the Price Control Act to contemplate a remedy other than a restraint, specifically, an order for monetary recovery by way of restitution. *Porter v. Warner Holding Co.*, 328 U.S. 395, 399, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946).

b. The effect of a "likelihood of success" finding on the choice of an interim remedy.

The Commission argues most strenuously than even if a hold separate order in lieu of a preliminary injunction barring an acquisition is compatible with Section 13(b) in some circumstances, such an order, commanded by the court, never comports with the public interest in a horizontal merger case once the FTC has demonstrated a likelihood of ultimate success on the merits and the risk of anticompetitive harm *pendente lite*. *See* Brief of Appellant at 54 (in every known case presenting these features courts have found a hold separate order an inappropriate substitute for a full stop preliminary injunction). In such a case, the Commission maintains, the court must issue a full stop order to assure that adequate final relief will be available and to prevent interim anticompetitive harm.

While we do not adopt the absolute position the FTC espouses, we agree that a likelihood of success finding weighs heavily in favor of a preliminary injunction blocking the acquisition during the course of proceedings on the Commission's administrative complaint. Section 13(b) authorizes such an order after the court has "weigh[ed] the equities and consider[ed] the Commission's likelihood of ultimate success." While the words of the statute are permissive, not mandatory, the underlying intent to secure effective antitrust enforcement indicates that, once the FTC has shown a likelihood of success, a preliminary injunction stopping the merger should issue unless three countervailing features mark the particular case: significant equities favor the transaction *and* the less drastic restraint of a hold separate order realistically can be expected (a) to safeguard adequate eventual relief if the merger is ultimately found unlawful, and (b) to check interim anticompetitive harm. This approach avoids two undesirable extremes. It does not countenance "equity [which] varies like the Chancellor's foot." [29] Neither does it displace the independent judgment of the court by committing to the sole discretion of the FTC the decision whether, despite a likelihood of success assessment, factors unique to the particular case warrant acquiescence in a hold separate order. [30]

We thus resist holding that a court has no remedial choice once it finds a likelihood of ultimate success (and, absent *any* restraint, a prospect of interim harm) but must leave it to the FTC to acquiesce or not in relief less stringent than a full stop preliminary injunction. We recognize, however, that, in many situations, a hold separate order would not adequately secure eventual final relief or prevent interim anticompetitive harm. We indicate below some of the considerations that, in particular cases, will weigh against provisional relief less potent than a merger-blocking preliminary injunction.

A hold separate order that cordons the acquired assets, even if it preserves the possibility of divestiture, [31] may risk trans-

**29.** *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975) (quoting *Gee v. Pritchard*, 2 Swans. *403, *414, 36 Eng.Rep. 670, 674 (Ch. 1818) (Eldon, L.C.)).

**30.** While the FTC urges that courts should have no discretion to command a hold separate order in a horizontal merger case when likelihood of success and potential interim harm are established, the Commission has not suggested that it is bound by a similarly rigid rule. We note that in at least two reported cases involving horizontal mergers, the FTC withdrew requests for a preliminary injunction following stipulations by the respondents to hold the acquired assets separate. *FTC v. Pillsbury Co.*, 1976–2 Trade Cas. ¶ 61,200 (N.D.Ill.1976) (stip-ulated injunction under 13(b) directing respondent to create new subsidiary to control challenged assets, to be held separate from parent *pendente lite*); *A.G. Spalding & Bros.*, 56 F.T.C. 1125, 1126 (1960) (Commission application for court order blocking a merger under All Writs Act withdrawn upon stipulation that respondent would hold acquired company separate).

**31.** In the absence of *any* preliminary restraint, the prospect of ultimate divestiture may not prevent permanent anticompetitive harm. An acquisition, if initially unchecked, may be attended by the transfer of confidential information or the scrambling of management, books, and assets. *See FTC v. Dean Foods Co., supra* note 20, 384 U.S. at 606–07 n.5, 86 S.Ct. at 1744 n.5, 16 L.Ed.2d 802 (1966); *FTC v. Lancaster*

fer of confidential information from the acquired, "held separate" company to the acquiring company.[32] If that transfer occurs, ultimate divestiture will not fully restore competition because the acquiring company will retain trade secrets of its acquired competitor. Similarly, a hold separate order may be ineffective if unique management personnel serve the acquired company.[33] A talented entrepreneur may not remain at the helm of the business once it is placed under the aegis of another company. Nor will a hold separate order preserve divestiture as an effective ultimate remedy if the held separate assets are not sufficiently attractive to interest a buyer or if the only likely disposition of the assets is a sale that would itself lessen competition.[34]

As to interim anticompetitive harm, the practicalities of the situation suggest that, even if all or part of an acquired company is held separate from its acquiring parent, competition between the enterprises will not retain the vigor it had prior to the merger.[35] A hold separate order, therefore, may not be a feasible device where the competitiveness of firms in a particular industry turns, in large part, on aggressive or innovative management initiatives. Hold separate orders will also be contraindicated where the acquired company was planning prior to the acquisition to embark on a new pro-competitive venture;[36] where it is not in the acquiring company's economic interest to preserve its new purchase as a going business;[37] where goodwill built up by the

---

*Colony Corp.,* 434 F.Supp. 1088, 1096–97 (S.D. N.Y.1977); *United States v. Ingersoll-Rand Co.,* 218 F.Supp. 530, 543 (W.D.Pa.1963); Elzinga, *The Antimerger Law: Pyrrhic Victories,* 12 J.L. & Econ. 43, 53 (1969). On several occasions, defendants whose acquisitions were found unlawful under the Clayton Act have argued to a court or the Commission that divestiture of the unlawfully acquired assets would be unduly burdensome because those assets had become inextricably intertwined with the defendant's operations. In at least three cases this argument succeeded and the defendants were allowed to keep their illegally acquired assets. Pfunder, Plaine & Whittemore, *Compliance with Divestiture Orders Under Section 7 of the Clayton Act: An Analysis of the Relief Obtained,* 17 Antitrust Bull. 19, 76–77 & n.84 (1972).

**32.** *See, e.g., F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.,* 597 F.2d 814, 818 (2d Cir. 1979) (access to confidential trade information); *FTC v. Rhinechem Corp.,* 459 F.Supp. 785, 790 (N.D.Ill.1978) (transfers of fruits of research and development programs); Halverson, *The Federal Trade Commission's Injunctive Powers Under the Alaska Pipeline Amendments: An Analysis,* 69 Nw.U.L.Rev. 872, 875 (1975).

A hold separate order was entered in *FTC v. Exxon Corp.,* 1979–2 Trade Cas. ¶ 62,972 (D.D.C.1979), although significant trade secrets were possessed by both the acquiring and acquired companies. Based on its "knowledge of a number of factors quite unique to that case," the Commission acquiesced in the hold separate order. Brief of Appellant at 56 n.2.

**33.** *See, e.g., United States v. Wilson Sporting Goods Co., supra* note 24, 288 F.Supp. at 569 (N.D.Ill.1968) (key to acquired company's success was management by company president).

**34.** *See* Elzinga, *supra* note 31, at 54–59; Pfunder, Plaine & Whittemore, *supra* note 31, at 68–75.

However, absent such factors, a hold separate order may effectively secure ultimate divestiture as an adequate remedy. For example, in *United States v. Brown Shoe Co.,* 1956 Trade Cas. ¶ 68,244 (E.D.Mo.1956), the Government challenged the acquisition of G.M. Kinney Co. by the respondent. The district court issued a preliminary order requiring Kinney to be held separate *pendente lite.* The merger was ultimately held unlawful, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), and Kinney was divested to a noncompetitor. The divestiture was rated adequate in a comprehensive study. Elzinga, *supra* note 31, at 48.

**35.** L. Sullivan, Antitrust 671 (1977); Note, *Preliminary Relief for the Government Under Section 7 of the Clayton Act,* 79 Harv.L.Rev. 391, 395 (1965) ("Even a subsidiary with completely independent management will have a tendency not to compete very hard against its parent.").

**36.** *See Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc.,* 414 F.2d 506, 516 (3d Cir. 1969) (pending negotiations for license of European product stalled by proposed acquisition), *cert. denied,* 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970).

**37.** *Cf. FTC v. Dean Foods Co., supra* note 20, 384 U.S. at 601, 86 S.Ct. at 1741, 16 L.Ed.2d 802 (1966) (respondent bought competitor with intent to use equipment and customer lists for own purposes and have acquired company go out of business).

acquired company might be impaired by its association with the acquiring company;[38] where uncertainty about the acquired entity's future may substantially impair its ability to achieve long-term contracts necessary for its continued vitality [39] or notably undermine personnel recruitment and employee morale and performance;[40] or where the acquired company markets its products through distributors who may leave the fold in anticipation of the ultimate integration of the acquired entity into its purchaser.[41]

In sum, a hold separate order, in face of an FTC showing of a likelihood of success, should not issue absent careful review of the particular features of the proposed merger and a reasoned determination from the evidence that the milder restraint will operate as an adequate preservative (impeding interim harm, and safeguarding eventual divestiture) and, in view of the equities entailed, genuinely serve the public interest. When such a determination is fairly made, however, the hold separate order can secure important benefits that a merger-blocking preliminary injunction would sacrifice. A preliminary injunction may kill, rather than suspend, a proposed transaction.[42] A hold separate order, on the other hand, aims to preserve a transaction that may, after all, turn out to be legal. In addition, a hold separate order shifts the risk of decline in value of the challenged assets from the acquired company to the acquiring company. *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343–44 n.26 (D.C.Cir.1980). Finally, such an order permits the public immediately to reap the unchallenged benefits of a proposed transaction where, as in this case, the Commission disputes only part of the transaction.

Having rejected the Commission's proposed *per se* rule that courts may not impose, *sua sponte*, a hold separate order in lieu of a full stop preliminary injunction when the Commission has established a likelihood of ultimate success, we turn finally to the question whether the district court acted reasonably in directing a hold separate arrangement in this case.

**C. The District Court's Exercise of Discretion.**

In the preceding section, we ruled that, even when the Commission establishes a likelihood of success on the merits, a court may enter a hold separate order rather than a merger-blocking preliminary injunction if (1) strong equities favor consummation of the transaction; (2) a hold separate order will check interim competitive harm; and (3) such an order will permit adequate ultimate relief. We now consider whether the district court's disposition comports with this ruling.

We have no occasion to question the district court's determination that the Commission had established a likelihood of success on the merits. No cross-appeal has been pursued on this issue. The district court concluded from the evidentiary presentation that the merger would "significantly" increase concentration in an already concentrated West Coast corrugating medium market, eliminate Menasha as a competitor, and increase the likelihood of collusion. 1981–1 Trade Cas. ¶ 63,974, at 76,044–45. The motions panel observed in this regard that the Commission had made a *"strong* showing . . . that the merger . . . violates Section 7 of the Clayton Act." 648 F.2d at 741 (emphasis in original).

---

**38.** *Hamilton Watch Co. v. Benrus Watch Co.*, 114 F.Supp. 307, 314 (D.Conn.) (association of acquired company with acquiring company's negative business reputation caused immediate harm to acquired company's merchandising policy), *aff'd*, 206 F.2d 738 (2d Cir. 1953).

**39.** *Elco Corp. v. Microdot, Inc.*, 360 F.Supp. 741, 753 (D.Del.1973).

**40.** *See, e.g., Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc., supra* note 36, 414 F.2d at 515–16.

**41.** *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc., supra* note 32, 597 F.2d at 818.

**42.** *See FTC v. Exxon Corp., supra* note 7, 636 F.2d at 1343 (D.C.Cir.1980). If parties can count on generous resort to hold separate orders, however, they will have a diminished incentive to arrange the acquisition in a manner consistent with the antitrust laws.

But the district court proceeded to identify strong equities favoring the merger. The court found that Weyerhaeuser was almost certain to increase linerboard supply by constructing a new linerboard mill at the site left undeveloped by Menasha near North Bend.[43] Construction of the linerboard mill will alleviate unemployment in North Bend and the surrounding area, and it is likely to provide an output for which there is a demand in this country as well as abroad. We deem significant in evaluating these equities the FTC's recognition that "Weyerhaeuser's initial interest [in an acquisition from Menasha] focused on the [undeveloped] mill site," and that "there are no other known comparable mill sites in the West Coast region." FTC's Proposed Findings 90 n.2, 98 n.1, J.A. 863, 867.

In the private equity category, the district judge stated that the merger would permit Menasha's shareholders to trade their illiquid shares in that company for highly liquid Weyerhaeuser stock. More was at stake than the private financial gain that might attend any merger. The exchange would relieve pressure on the company to redeem shares of stockholders seeking to meet death taxes or other obligations. While similar benefits might have been obtained from a transaction that did not elicit the FTC's concern, the district court could properly consider Menasha's interest in disposing at once of all its West Coast paperboard facilities so that it could concentrate on expanding and improving its Midwest production.[44] Taken together, we find the public and private equities in this case sufficient to satisfy the first condition of our test. We do not believe the district court's weighing of these equities is appropriately characterized as an abuse of discretion.

The district judge further determined that a hold separate order would satisfy the second element of our test. He found such an order adequate to check interim anticompetitive harm. The order forbids Weyerhaeuser from taking any "direct or indirect" action that would interfere with the North Bend corrugating medium mill's operation as a "separate and ongoing enterprise." J.A. 1035B. Menasha must recruit any additional management and sales personnel needed to operate the medium mill as an "independent competitor." Id. None of the management or sales personnel of the mill may own stock in Weyerhaeuser, and none may have been recent employees of Weyerhaeuser. Id.

In addition, the hold separate order addresses two of the Commission's specific concerns in prosecuting this action. The North Bend corrugating medium mill may not give Weyerhaeuser's container plants any preference, id.; therefore, the mill's supply of medium will be available on the open market. Further, Weyerhaeuser may not reduce annual production at the mill. Id.[45] This restriction is of key importance, since the FTC indicated that "the basic theory of [its] case" was that the merger would give Weyerhaeuser "an inordinate ability to restrict production if they wanted to raise prices." J.A. 808C (inquiry of district judge during FTC's closing argument). The district court's order, however, is plainly intended to prevent the North Bend medium mill from participation in any agreement, implicit or explicit, to reduce supply and thus raise prices. Moreover, the FTC,

---

**43.** Whether the district court's presentation of its findings is protracted or terse, see Dissent note 26, our task is to determine whether those findings are adequately supported in the record. Earlier in this opinion, we explained our conclusion, based on our review of the record, that the findings in point may not be dismissed as clearly erroneous. See pp. 1078–80 supra.

**44.** See also note 17 supra and note 50 infra.

**45.** We note in this regard the repeated testimony at trial that it is difficult and uneconomical to slow or shut down production of a medium mill. See, e. g., J.A. 119–22, 124–25 (testimony of John Presson, Weyerhaeuser containerboard logistics manager); J.A. 153–54 (testimony of Cornelius Roosevelt Duffie, Willamette Industries chairman of the board); J.A. 176 (testimony of Thomas Williscroft, general manager of North Bend mill). But see J.A. 495–96 (cross-examination of FTC's expert witness, Walter J. Mead) (medium production may be restricted by shutting down a mill or a production line).

pursuant to the order, may request further and more precise directions to carry out its purpose. J.A. 1035C. Given the circumstances of the industry, the initial terms of the hold separate order, and the avenue open to the FTC to seek clarifying or strengthening provisions, we find that the district judge reasonably concluded that such an order would prevent interim anticompetitive harm.[46]

We emphasize that the record in this case does not manifest impediments to effective operation of a hold separate order. *See* pp. 1085–87 *supra*. The merger forestalled no plans by Menasha to embark on new, aggressive competition. It is in Weyerhaeuser's economic interest to maintain the vitality of the North Bend medium mill; should the FTC ultimately fail in its complaint, Weyerhaeuser expects to use the medium mill to supply its own box plants. *See* J.A. 326–27 (testimony of John H. Waechter, Weyerhaeuser vice president in charge of paperboard and packaging). Since corrugating medium is a fungible product, there is little brand loyalty, *see, e. g.*, J.A. 458–59 (testimony of James B. Hoover, executive vice president of Newark

Group, Inc.); demand for medium produced by the North Bend mill should not slacken while it is held separate. The North Bend medium mill does not market its product through a network of distributors that may wither away during the pendency of an administrative proceeding. Further, although the FTC expert witness asserted at one point that Menasha was a particularly independent competitor, J.A. 606 (redirect examination of Walter J. Mead), the evidence does not appear to support that assertion. As Steven V. Hudson, a manager for International Paper, explained, Menasha (like most medium manufacturers) consumed most of its corrugating medium, either directly or indirectly, in its own box plants. J.A. 422. Menasha's North Bend mill sold only 4.2% of its output on the open market. J.A. 260 (testimony of Richard Johnson, chairman of Menasha's board of directors). Trading only this small amount of medium on the open market, Menasha is not readily labeled a markedly "independent" or "aggressive" competitor. In sum, we cannot discern, nor has the FTC directed our attention to, any specific ways in which a well-designed hold separate order would

**46.** Shortcomings in the order, including those our dissenting colleague notes, appear susceptible to cure without extraordinary effort on the part of the district court and the FTC. Nor do we believe the district court lacks means to check blatant circumvention should Weyerhaeuser attempt it. In such an event, a divestiture order need not await termination of the administrative proceedings.

*En passant*, we note that the Menasha enterprise is not a "ghost" but remains alive and well. *Cf.* Dissent note 8. Menasha sought the merger to tighten, not to abandon, its operations.

In addition to insisting that a 13(b) restraint must be an all or nothing proposition, and attempting to reduce to insignificance the undeveloped mill site that first sparked Weyerhaeuser's interest in a transaction with Menasha, the dissenting opinion sounds and replays a third theme: the incompetence of courts to administer effectively a short-term hold separate order. We fully agree that such orders should not be routine. Section 7 of the Clayton Act is preventive in nature. Rather than relying dominantly on the government or the courts to punish individual wrongdoers, Section 7's thrust is to promote the maintenance of vigorous competition as the prime deterrent to

anticompetitive acts such as artificial reductions in output. *Cf.* 15 U.S.C. § 1 (prohibiting conspiracies in restraint of trade); *id.* § 45(a) (prohibiting unfair methods of competition). Accordingly, hold separate orders should be entered only upon close analysis of the particular case, using the three-pronged test we have stated. However, we are less fearful than our dissenting colleague that the district court administering a hold separate order is destined to wander "lost in a labyrinth." *See* Dissent at 1093. We emphasize that the court below imposed a hold separate order with respect to an independent, self-sufficient, economically attractive entity, producing a fungible product. In light of far more complex orders district courts actively supervise when called upon by the law to exercise "independent judgment" in shaping equitable relief, *see, e.g.*, Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L.Rev. 1281 (1976), we do not share the dissenting opinion's view that courts are so ill-equipped to grapple with a business venture that they must steer clear of a hold separate order even when such a restraint would guard against anticompetitive harm, preserve the viability of divestiture, and secure benefits to the public and private parties that a full stop order would jeopardize.

be inadequate to prevent interim anticompetitive harm in this case.

The district court further determined that the third prong of our test was satisfied. He concluded from the evidence that eventual divestiture would be a "feasible remedy." 1981–1 Trade Cas. ¶ 63,974, at 76,048. We find no fatal flaw in his conclusion. Nor has the FTC or our dissenting colleague suggested any. The evidence showed that the North Bend corrugating medium mill is an efficient, low-cost operation,[47] an attractive asset that Menasha has operated as a largely self-sufficient entity.[48] The manufacture of medium involves no trade secrets that could be siphoned off by Weyerhaeuser during the administrative proceedings. And, as mentioned above in relation to the efficacy of the hold separate order to prevent interim anticompetitive harm, customers of the mill are not likely to develop a "brand name" loyalty, since medium is a fungible product.[49] It appears, therefore, that in the event the acquisition is held illegal, Weyerhaeuser could dispose of the North Bend mill through sale to another wood product manufacturer[50] or sale to a manufacturer in an unrelated market.[51]

■ Since it was not unreasonable to conclude that public and private equities favored the merger, and that a hold separate order could protect against interim harm and preserve the prospect of effective ultimate relief, we hold that the district judge did not abuse his discretion in denying a full stop preliminary injunction and in granting instead a less drastic restraint. Our decision is not intended to encourage district judges to compromise the public interest in antitrust enforcement with a "Solomonlike" judgment in favor of a hold separate order whenever any equities favor the transaction. Each case must be approached on its unique facts and with appropriate attention to the purpose of Section 13(b).[52]

**47.** This fact is undisputed. *See* Brief of Appellant at 6.

**48.** *See, e.g.*, Internal Revenue Service Application of Menasha Corp. and its Shareholders and Weybuy, Inc. for Rulings (FTC Exhibit 51), at 18–19, J.A. 1244–45 (describing independence of West Coast operations and explaining why each of those assets, including the North Bend medium mill, are separately managed); J.A. 168 (testimony of Thomas Williscroft, general manager of North Bend mill) (he has entire authority for medium mill except for distribution). The FTC's own expert witness testified that if the parties "rigorously followed" a hold separate order, separating the North Bend medium mill from Weyerhaeuser would be "no great problem." J.A. 657 (testimony of Walter J. Mead in response to court inquiry).

**49.** *See, e.g.*, J.A. 458–59 (testimony of James B. Hoover, executive vice president of Newark Group, Inc.).

**50.** Before Menasha closed the deal with Weyerhaeuser, several forest product manufacturers had expressed tentative interest in acquiring Menasha's assets. *See* J.A. 271–73, 277 (testimony of Richard Johnson, chairman of Menasha's board of directors). Any of these companies might be interested in buying the North Bend medium mill from Weyerhaeuser.

The availability of potential purchasers of the North Bend mill does not mean that Menasha could have readily sold its assets to one of these companies rather than to Weyerhaeuser. Menasha sought to negotiate the sale of its assets in utmost confidentiality and to dispose of all its West Coast paperboard product facilities. *See, e.g.*, J.A. 287 (cross-examination of Richard Johnson); J.A. 328 (testimony of John H. Waechter, Weyerhaeuser vice president). These conditions might have been considerably more difficult to satisfy than an openly advertised sale of the medium mill alone.

**51.** *Cf.* Affidavit of Clark S. Johnson (executive vice president of Virginia Fibre Corporation) (describing operations of virgin entrant into corrugating medium market—company produces 600 tons per day of medium, but owns no timberlands or corrugated container plants), J.A. 1459–60.

A further divestiture device is a spin-off to some of the acquiring company's own shareholders. Where the divesting company is owned by a large number of shareholders, and control is not concentrated in a few hands, a spin-off can be effective in creating an independent company owned by the same shareholders as the divesting company on a pro rata basis. *See* Pfunder, Plaine & Whittemore, *supra* note 31, at 50–54 n.38.

**52.** We noted earlier the FTC's assertion that "[t]he hold-separate 'remedy' substituted by the district court has been found inappropriate in *every* known horizontal merger case in which the plaintiff sought a preliminary injunc-

## CONCLUSION

In accordance with the foregoing, we affirm the district court's order,[53] and remand the case for further proceedings to implement the hold separate arrangement.

*It is so ordered.*

MIKVA, Circuit Judge, dissenting:

I agree with Part II of the majority opinion that this case is not moot; therefore we must confront the harder question of how to meet the congressional mandate under Section 13(b) of the Federal Trade Commission Act.[1] The majority finds, in the first case to do so, that a court may issue a "hold-separate order" under section 13(b) even though that term is not used in that section. I would hold that when the statutory requirements for relief under 13(b) have been satisfied, a court may grant only the relief provided by the statute. In this case the Federal Trade Commission (FTC) met the requirements of 13(b), and the district court therefore had no reason to invoke its equitable power. I would reverse the district court's denial of a preliminary injunction.

One need not fall back on secondary canons of construction to decipher section 13(b). The plain words of a statute are the best indications of legislative intent. "No single argument has more weight in statutory interpretation ...."[2] Section 13(b) provides that "a temporary restraining order or a preliminary injunction may be granted without bond." Nevertheless, the majority concludes that Congress intended to include a third remedy—the less-than-efficacious "hold-separate" order. If Congress had intended that hold-separate orders be an alternative remedy when it enacted 13(b), it could easily have so stated.[3] As the majority opinion notes, the first reported government effort to enjoin a merger under the Clayton Act resulted in a hold-separate order in 1956.[4] When Congress enacted 13(b) twenty years later it mandated only two forms of relief: temporary restraining orders and preliminary injunctions.[5]

A hold-separate order is appropriate only when the Commission fails to make the showing necessary to be granted relief under 13(b). A hold-separate order thus may be warranted when the FTC is unable to make a sufficient showing of a likelihood of

---

tion and demonstrated the necessary likelihood of success and interim competitive harm." Brief of Appellant at 54 (emphasis in original). Generally, however, the authorities in point do not reject the hold separate order categorically. Rather, decisions turn on the particular circumstances presented. The test we have outlined should secure merger-blocking preliminary injunctions when a lesser restraint would be inadequate or unmanageable without shrinking the court's obligation to exercise independent judgment in selecting and tailoring the remedy to fit the case at hand.

**53.** By separate order entered today, we have directed that, effective ten days from this date, the motions panel's order shall be vacated. This will afford the FTC sufficient time to seek further preliminary relief from the Supreme Court, if it so desires.

**1.** 15 U.S.C. § 53(b) (1976).

**2.** *Browder v. United States*, 312 U.S. 335, 338, 61 S.Ct. 599, 601, 85 L.Ed. 862 (1941).

**3.** For example, when Congress enacted the Emergency Price Control Act of 1942, § 205(a), 56 Stat. 23 (1942), it provided for the issuance

of permanent or temporary injunctions, restraining orders, "or other order[s]."

**4.** *United States v. Brown Shoe Co.*, 1956 Trade Cas. ¶ 68,244 (E.D.Mo.1956).

**5.** Both a temporary restraining order and a preliminary injunction are "in form and effect a preliminary restraint." See Maj. Op. at 1084. I do not understand why Congress would have bothered to specify both of those, but not hold-separate orders, if the majority is correct in its assumption that Congress intended that *any* form of preliminary restraint could be granted. Instead, it seems logical to assume that the two forms of relief specified in the statute are included because both prevent mergers likely to be illegal, while hold-separate orders were not included because they do not achieve that result. The acknowledged history of hold-separate orders at the time section 13(b) was passed makes the absence of such a remedy from the statute more compelling. I cannot understand how a court can insinuate "several hundred years of history" into a legislative product that neither by its terms nor *its* history allows such flexibility. *See id.*

success on the merits to be entitled to an injunction,[6] or when the equities weigh against granting an injunction. A district court may then, relying upon its inherent equitable powers, decide whether to grant a hold-separate order.

The well-known deficiencies of hold-separate orders supply the obvious reason for their exclusion as an alternative remedy when the FTC has satisfied the requirements for relief under 13(b). The majority opinion acknowledges many of their common deficiencies,[7] and I need not repeat them here. However, this case provides a good example of the Siren quality of hold-separate orders that initially appear harmless or even beneficial. Such orders may seem attractive as compromise remedies in difficult cases, but their efficacy is in most cases a sham, and they place courts in a business management role for which the judiciary is ill-suited.

The district court and the majority recognize that supervision and further litigation will be necessary under this hold-separate order, but they ignore the direct cost to the public of litigating the order's specific provisions and of litigating compliance with it.[8]

In addition, the majority turns a blind eye to the costs to the public of permitting this merger to be consummated—both interim costs and ultimate costs. The majority, with a great leap of faith, believes that, by court order, Weyerhaeuser West Coast will compete with Weyerhaeuser *on* the West Coast. With considerable nonchalance the majority states: "The order forbids Weyerhaeuser from taking any 'direct or indirect' action that would interfere with [Weyerhaeuser West Coast's] North Bend corrugated medium mill's operation as a 'separate and ongoing enterprise;' "[9] "[Weyerhaeuser West Coast's] North Bend corrugated medium mill may not give Weyerhaeuser's container plants any preference;"[10] "The district court's order ... is plainly designed to prevent [Weyerhaeuser West Coast's] North Bend medium mill from participating in any agreement [with Weyerhaeuser], implicit or explicit, to reduce supply and thus raise prices."[11] After accepting the possibility that a court can thus ordain effective competition, it is a small step for the majority to expect that officers and directors chosen by Weyerhaeuser will engage in genuine competition with Weyerhaeuser.[12]

Most importantly, while the majority concludes with satisfaction that the court order will prevent Weyerhaeuser from harming the public by reducing the production of Weyerhaeuser West Coast, Weyerhaeuser's

---

**6.** It is unclear whether the majority would uphold even a hold-separate order under 13(b) when the FTC's proof of a likelihood of success on the merits is weak, particularly since, in its view, a hold-separate order suffices when the FTC makes a *strong* showing of a likelihood of success on the merits.

**7.** *See* Maj. Op. at 1085–87 & nn.30–41.

**8.** For example, Menasha, the corporate entity specified in the hold-separate order, will not exist after today's decision. Will Menasha's ghost

> report to the court within ten days of entry of this order concerning what, if any, additional management and sales personnel are needed to operate the North Bend Mill as an independent competitor in the West Coast corrugating medium market, and within thirty days of the entry of this order, recruit such personnel, if any, as may be necessary to fill those positions[?]

Joint Appendix (J.A.) 1035B. The district court also ordered Weybuy, which cases to exist with the consummation of the merger, to report

plans for expansion within sixty days. J.A. 1035C. These ghosts may haunt the district court, but they are unlikely to file reports, recruit personnel, or plan expansions.

The hold-separate order creates problems for humans as well. What will former Menasha employees do with their Menasha stock, which becomes Weyerhaeuser stock lawfully owned but which, under the hold-separate order, they may not own? *See FTC v. Weyerhaeuser Co.,* 1981–1 Trade Cas. ¶ 63,974, at 76,047 (D.D.C. Mar. 25, 1981) *and* J.A. 1035B.

**9.** Maj. Op. at 1088.

**10.** *Id.*

**11.** *Id.* at 1088–89.

**12.** The directors and officers of Weybuy, the *entity created by Weyerhaeuser for the purpose of this merger,* will become Weyerhaeuser West Coast's directors and officers.

directors could be planning to reduce their own production, which would accomplish the same result. Thus, Weyerhaeuser may with the greatest of ease circumvent the restriction that the majority finds of "key importance." [13]

In addition to the costs to the public that necessarily flow from a hold-separate order with such obvious deficiencies, the public will bear the costs of eventual divestiture litigation if the merger is found illegal. Alternatively, the public will bear the cost of a merger likely to be anticompetitive in the event that the FTC decides not to expend any more of its limited resources litigating this merger.

As this case demonstrates, to devise an effective hold-separate order and ensure compliance with it a court must risk losing its way in the labyrinth of the business world. "The judiciary is unsuited to affairs of business management; and control through the power of contempt is crude and clumsy and lacking in the flexibility necessary to make continuous and detailed supervision effective." [14] Congress so recognized, and therefore did not include hold-separate orders as an available remedy when it enacted section 13(b). When the FTC satisfies the requirements of 13(b), the statute permits only the issuance of a temporary restraining order or a preliminary injunction barring the merger.

In this case, the FTC did satisfy the requirements for relief under 13(b). The district court found that the proposed merger, which will catapult Weyerhaeuser from seventh largest producer of corrugating medium on the West Coast to the number one position, "will significantly increase concentration in the market; it will result in the elimination of a substantial competitor; and it will increase the likelihood of collusion." [15] Thus, the district court concluded that the FTC had established a likelihood of success on the merits. A panel of this court characterized this as a "strong" showing that the merger would violate section 7 of the Clayton Act. [16]

Having found a likelihood of success on the merits, the district court was obliged to balance the equities. "Weighing the equities" traditionally consists of an examination of three of the requirements for obtaining injunctive relief: the harm to the plaintiff if an injunction is not granted, the harm to others from the issuance of an injunction, and the public interest. [17] And in any suit for injunctive relief the balance of hardships may be tipped by the strength of the plaintiff's showing of a likelihood of success on the merits. [18]

With regard to the first factor, in 13(b) cases Congress mandated a presumption that irreparable harm would occur absent an injunction. [19] As for harm to others, Menasha and Weyerhaeuser did not show that consummation of this particular transaction was necessary to prevent any presently existing threat of harm to anyone, and the district court found no such threat. The district court found only that if a preliminary injunction were granted, Menasha would likely lose the benefit of this particular transaction, to the possible detriment of the company and its stockholders. [20]

Thus, the only possible harm to others that might result from the issuance of an injunction in this case is purely speculative injury to Menasha's stockholders and the company. [21] But speculative harm is not the

---

13. Maj. Op. at 1088.

14. *United States v. Paramount Pictures*, 334 U.S. 131, 163, 68 S.Ct. 915, 932, 92 L.Ed. 1260 (1948).

15. 1981–1 Trade Cas. ¶ 63,974, at 76,045.

16. *FTC v. Weyerhaeuser*, 1981–1 Trade Cas. ¶ 63,935, at 75,836 (D.C.Cir. April 7, 1981).

17. *Washington Metropolitan Area Transit Authority v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977).

18. *Id.*

19. *See* Maj.Op. at 1082 & n.23 and cases cited; *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980).

20. 1981–1 Trade Cas. ¶ 63,974, at 76,048.

21. *See* 1981–1 Trade Cas. ¶ 63,935, at 75,837.

basis on which an injunction may be granted, nor can it justify denying a remedy specified by Congress. Just as an injunction "will not be granted against something merely feared as liable to occur at some indefinite time in the future,"[22] an injunction may not be denied merely because someone might possibly be harmed at some time in the indefinite future.[23] In almost every merger case stockholders can claim that benefits will be lost if the merger is barred. Indeed, the more illegal the merger, the greater the lost benefits may be. If these losses are the measure of equity, no injunction will ever issue. As the majority acknowledges, this showing of private equities is not sufficient reason to justify denial of an injunction.

The final factor to be weighed is the public interest. Denying an injunction will immediately defeat the public interest in maintaining the status quo pending a final determination on the merits;[24] granting an injunction would preserve the status quo. Denying an injunction will immediately eliminate Menasha as a West Coast competitor of Weyerhaeuser, making Weyerhaeuser the number one producer of corrugating medium on the West Coast. Granting an injunction would prevent this merger of horizontal competitors, and further the public interest in "arrest[ing] anticompetitive tendencies in their 'incipiency,'" the fundamental purpose of the Clayton Act.[25]

The district court and the majority disregard these immediate effects, and instead make much of the piece of vacant land that Weyerhaeuser will obtain from Menasha as a result of this merger. This land is accorded an almost talismanic significance because Weyerhaeuser is likely to build a new mill on the land some time in the indefinite future. The district court found, and the majority accepts, that if Weyerhaeuser builds the mill, the mill will increase employment in the mill town, as well as increase the supply of linerboard.[26] This house of cards would hardly withstand the faintest breeze. What if Weyerhaeuser does not build the mill? What if the mill is unprofitable and fails? What if Weyerhaeuser would have instead invested in another development? What if Weyerhaeuser for some reason cannot build the mill? What if demand for linerboard decreases in the future, and building a new mill makes no economic sense at that indefinite time in the future when a mill would be built?

Even if Weyerhaeuser would build the mill and all the benefits imagined would flow from that mill, granting an injunction instead of denying one might just as likely result in the same benefits. The FTC did not seek an injunction to stop the building of a mill on vacant land, and an injunction would not have that effect. The FTC merely sought an injunction to prevent this particular merger from occurring. The land will not vanish, and Weyerhaeuser made no effort to show a likelihood that only Weyerhaeuser would build a mill or that it would build a better mill or that it would build a mill more quickly than anyone else. In the absence of such a showing, it cannot be said that granting an injunc-

---

**22.** *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931).

**23.** *See Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co.*, 363 U.S. 528, 535, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1435 (1960); *Siemens*, 621 F.2d at 506, 510; *Dorfman v. Boozer*, 414 F.2d 1168, 1173 (D.C.Cir. 1969). It would fly in the face of reason to find that Congress intended that *defendants* need not show any threat of actual harm from the granting of an injunction, when the intent of the statute was to ease the burden of the FTC by not requiring *it* to show irreparable harm in order to obtain an injunction.

**24.** *See Holiday Tours*, 559 F.2d at 843.

**25.** *United States v. Philadelphia National Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963); *see Brown Shoe Co. v. United States*, 370 U.S. 294, 317, 322, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962).

**26.** 1981–1 Trade Cas. ¶ 63,974, at 76,048. I would note that public equities purportedly weighing against granting an injunction are mentioned in only four sentences of the district court's opinion.

tion would prevent a mill, or even the best mill possible, from being built. Thus, granting an injunction would not even indirectly prevent the public from receiving any benefits from the vacant land that denying an injunction may permit it to receive.

Nevertheless, the majority concludes that this particular merger is necessary to protect the public interest in Weyerhaeuser's ownership of this vacant land. The majority then holds that the public interest in benefits—the timing and magnitude of which the district court conceded to be uncertain [27]—from a mill yet to be built outweighs the public interest in enforcement of the antitrust laws. I agree that any mill may be beneficial to the public, but Congress did not delegate to the courts the choice of long-range goals for the general welfare when it enacted 13(b). It is the prerogative of Congress to strike the balance between the public interest in enforcement of the antitrust laws and the general public interest in full employment or a lower inflation rate, or whatever, if those goals are at odds. A merger is not saved "because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial." [28] For the same reason, a court may not refuse to enjoin a merger likely to be illegal in order to further long-range goals it may consider more important than the goals of the antitrust laws. "A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made ... by Congress." [29]

I am confounded by the majority's characterization of what might or might not happen in the indefinite future as "strong equities" favoring denial of a preliminary injunction. I cannot comprehend how a clouded crystal ball view of long-range goals totally unrelated to the policies expressed in the antitrust laws can be used to justify the denial of this injunction. Under the majority's interpretation of 13(b), it is permissible for a court to find that any public benefit—even one the public might receive in any event and even if of an indefinite magnitude—likely to occur at some indefinite time in the future outweighs the public interest in enforcement of the antitrust laws. Therefore, all a party need do to insulate a merger likely to be illegal is tack a piece of vacant land onto the deal and muster some supporting testimony of possible future benefits. Permitting such creative use of boot can sap the antitrust laws of their vitality and legislative purpose.

The findings of fact by the District Court mandate the issuance of a section 13(b) injunction. The general purpose of a preliminary injunction is to preserve the status quo pending final determination of an action, [30] and the Supreme Court "expressly recognized the importance of preliminary injunctive relief to the effective enforcement of the antitrust laws" [31] in *FTC v. Dean Foods Co.*, [32] even before Congress did so by enacting 13(b). Acting under 13(b) the FTC specifically demonstrated a strong likelihood of success on the merits. Congress mandated that under 13(b) the court should presume irreparable injury absent an injunction. The district court found no actual harm to others and no harm to the public that would result from the issuance of a preliminary injunction. Denying an injunction immediately destroys the status quo, and granting an injunction would preserve the public interest in preventing anti-

---

27. 1981–1 Trade Cas. ¶ 63,974, at 76,048; *see also id.* at 76,047 ("their magnitude remains uncertain").

28. *United States v. Philadelphia National Bank,* 374 U.S. 321, 371, 83 S.Ct. 1715, 1745, 10 L.Ed.2d 915 (1963).

29. *Id.*

30. *District 50, United Mine Workers v. International Union, United Mine Workers,* 412 F.2d 165, 168 (D.C.Cir.1969).

31. *Federal Trade Commission v. Exxon Corp.,* 636 F.2d 1336, 1343 (D.C.Cir.1980).

32. 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966).

competitive mergers. An injunction should have been granted.

I am concerned not just about the consequences of this particular merger. The creative surgery that has been performed on Section 13(b) by the majority will sever preliminary injunctions from the statute. The parties and courts are being told that a hold-separate order is about as good as a preliminary injunction, and that this court will resolve the hard cases arising under 13(b) the easy way. "If parties can count on generous resort to hold separate orders . . . they will have a diminished incentive to arrange the acquisition in a manner consistent with the antitrust laws."[33] Acquisition-minded parties will further discover that adorning an acquisition with some vacant land or other appurtenance will permit flouting the prohibitions against mergers that Congress thought it was legislating. Finally, the elevation of the hold-separate order to a worthy remedy under section 13(b) will thrust the courts into an activist supervisory role that ill suits them. Congress never suggested that judges ought to manage the ongoing, day-to-day affairs of business. While the general equitable powers inherent to a court may permit such involvement in rare cases, I see no benefits to anyone in increasing the number of occasions for such involvement. In any event, the plain meaning of section 13(b) does not warrant or allow such a result.

I dissent.