**FEDERAL TRADE COMMISSION, Plaintiff,**

v.

**PPG INDUSTRIES, INC.,**

**and**

**Swedlow, Inc., Defendants.**

**Civ. A. No. 86–0022.**

United States District Court, District of Columbia.

Feb. 21, 1986.

Steven A. Newborn, F.T.C., Bureau of Competition, Washington, D.C., for plaintiff.

Bertram M. Kantor (PPG), New York City, Carla A. Hills, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This antitrust case is before the Court on the application of the Federal Trade Commission ("FTC" or "Commission") for a preliminary injunction against the imminent acquisition by PPG Industries, Inc. ("PPG") of Swedlow, Inc. ("Swedlow") pursuant to an "Agreement and Plan of Merger" dated August 21, 1985, as amended January 9, 1986, pending completion of administrative proceedings (Docket No. 9204) before the Commission to prohibit the transaction permanently.[1] PPG proposes to pay $41.8 million ($32.60 per share) for all outstanding shares of Swedlow. The agreement is terminable at will by either party if not consummated by March 15, 1986. The Commission, however, alleges that the effect of a PPG-Swedlow merger "may be substantially to lessen competition or to tend to create a monopoly" in the production of aircraft transparencies in violation of section 7 of the Clayton Act. 15 U.S.C. § 18. Anticipating such a finding by the FTC, it asks that the parties be enjoined from implementing the merger in the meantime.[2] For the reasons set forth

---

1. Jurisdiction is conferred by 15 U.S.C. § 53(b), and 28 U.S.C. §§ 1337 and 1345.

2. Section 13(b) of the Federal Trade Commission Act provides, "upon a proper showing that,

below, the Court will grant the injunction, subject to a condition subsequent, namely, the entry of an appropriate hold separate order containing certain provisions hereinafter specified.

## I.[3]

PPG and Swedlow are two of the leading manufacturers of aircraft "transparencies:" the windshields, canopies, and cockpit and cabin windows of both commercial and military aircraft. PPG is a large, publicly-owned diversified Pennsylvania corporation for which aircraft transparencies represent but a small percentage of its business. Nevertheless, it is the world's largest manufacturer of glass transparencies and a significant supplier of acrylic and composite transparencies. Swedlow is a smaller, closely-held California corporation of so-called "garage shop" origin, with its controlling stock owned by its founder, David Swedlow, and close associates, who began the business shortly after the discovery of acrylics in the 1930's. In the years since, Swedlow has become the largest manufacturer of acrylic transparencies in the world, although it has never undertaken to make transparencies from glass. PPG and Swedlow are nevertheless frequent competitors for contracts to supply transparencies to major U.S. airframe manufacturers. Thus, because PPG plans to acquire a direct competitor, as opposed to a customer or supplier, the proposed merger is ostensibly horizontal in effect.

The Commission contends that the resulting entity will be a single, market-dominant firm possessed of a near-monopoly on the most advanced technology for the fabrication of transparencies from both substances, and any combinations or permutations thereof, with the predictable result on commerce in the product. PPG and Swed-

low respond that, despite their similarities in appearance and the efforts of many years to adapt them to the same purposes, glass and acrylic, as well as hybrids, remain fundamentally different products. Various dissimilar properties prevent their use interchangeably in all but a very few aircraft fenestrations. The merger is, therefore, they say, a "product extension" merger, the Commission having "gerrymandered" various possible product market definitions to make it appear as if they compete in the same market whereas, in fact, they do not.

 While opposing the Commission on the merits, PPG and Swedlow also urge the Court to consider a "hold separate" order as an alternative to a "full-stop" injunction, i.e., "a form of preliminary relief which permits the challenged transaction to go forward, but requires the acquiring company to preserve the acquired company (or certain of the acquired assets) as a separate and independent entity during the course of antitrust proceedings." *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1075 n. 7 (D.C.Cir.1981). The two primary purposes of a hold separate order are to maintain, insofar as possible, competitive balance during the pendency of the litigation and to make feasible adequate permanent relief, including divestiture, should the Commission ultimately prevail. *Id.*

 While the Court does not have to resolve finally whether or not the proposed merger violates section 7 of the Clayton Act, the likelihood of the Commission's ultimate success on the merits is the principal element in an award of any form of interim relief, being expressly prescribed by the statute as a prerequisite to an injunction, 15 U.S.C. § 53(b), and by case law as antecedent to hold separate orders as well. *Weyerhaeuser*, 665 F.2d at 1085–87. Like-

---

weighing the equities and considering the Commission's likelihood of success, such action would be in the public interest ... a preliminary injunction may be granted ...." 15 U.S.C. § 53(b).

**3.** Time being of the essence, and this Court's jurisdiction in the matter at an end with the

entry and enforcement of a preliminary injunction, it is unnecessary (and undesirable) for this Court to make detailed findings and conclusions upon issues which must ultimately be decided by the FTC and reviewed, if at all, by the Court of Appeals.

lihood of ultimate success on the merits, in turn, depends upon a proper definition of the relevant product and geographic markets, their structure, and the anticompetitive effects if any, of the proposed acquisition.

■ At this preliminary stage of the contest, upon the evidence now before the Court, it appears that the relevant product market is one of aircraft transparencies requiring, for want of a better term, "high technology" to produce, without regard to the materials of which they are fabricated. The recent history of the industry indicates that, on most aircraft, advanced glass and/or acrylic (or composite) transparencies are now—or will soon become—functionally interchangeable in the sense that each can substantially meet the design specifications established by the airframe manufacturers.[4] Glass and acrylic undoubtedly still do have advantages and disadvantages vis-a-vis one another, but producers of glass transparencies and manufacturers of acrylic transparencies consistently bid against one another for contracts to fill the same apertures, and the trend in their respective technological evolutions is

clearly in the direction of an eventual coalescence.[5]

■ The relevant geographic market within which to assess the effects of an acquisition must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962). Here the evidence points to a United States market for aircraft transparencies. While a single foreign company, the British firm Triplex Safety Glass Co. Ltd. ("Triplex"), presently sells transparencies to U.S. airframe manufacturers and the military, and some U.S. transparency manufacturers, including both PPG and Swedlow, do sell abroad, the total dollar sales resulting from these transactions is relatively insignificant.

The current United States all-transparency market—the closest available approximation of a high-tech market shown by the evidence—by all familiar antitrust standards, is already highly concentrated.[6] In 1984, the top four firms accounted for over 80 percent of all sales, the top eight firms more than 90 percent, and the Herfindahl-Hirschmann Index ("HHI") was 1,943.[7]

4. In defining a product market, the main consideration is cross-elasticity of demand, namely, "how far buyers will go to substitute one commodity for another." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956).

5. Compelling evidence of a "high technology" aircraft transparency market, despite their protests that it is a device of the Commission's imagination conjured in the absence of data, are PPG's and Swedlow's own internal documents which repeatedly refer to such a market and rarely draw distinctions between types of transparencies when making their own calculations of "market shares." For example, in a 1984 document, PPG states that the result of adopting what it calls "the aggressive strategies," which includes the acquisition of Swedlow, "would be the positioning of PPG as the dominant force in the free world market for high technology transparencies which could prevail for several decades." Moreover, in its 1984 long range plan, PPG refers to Swedlow as one of "our two largest competitors." Similarly, in a 1982 letter to employees, David Swedlow states, "[o]ur major competitor is [PPG]." Finally, in its 1982 long range plan, PPG notes that "the airframe

manufacturer has a choice of glass, plastic or composite windows, offering him a variety of material options."

6. *See* plaintiff's exhibit No. 147, Table B. The market shares, computed by the Commission largely from statistics provided by PPG, are concededly imprecise. Nevertheless, although PPG and Swedlow "may point to technical flaws in the compilation of these statistics, ... in cases of this type precision in detail is less important than the accuracy of the broad picture presented." *Brown Shoe*, 370 U.S. at 342 n. 69, 82 S.Ct. at 1533 n. 69.

7. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. The HHI takes into account the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as the disparity in size among those firms increases. The Justice Department divides the spectrum of market concentration as measured by the HHI into three regions that can be broadly characterized as unconcentrated (HHI below 1,000), moderately concentrated (HHI between 1,000 and 1,800), and highly concentrated (HHI

PPG was the largest manufacturer with a nearly 30 percent share of the market, and Swedlow a close second with about 23 percent. That market would become significantly more concentrated were PPG and Swedlow to merge. Not only would the new PPG/Swedlow entity have close to 53 percent of the market, two-and-a-half times as much as the nearest competitor, Sierracin Corp., (the only other firm both the Commission and defendants recognize as having comparable high-tech capabilities), but the HHI would rise over 1,300 points to 3,295. According to the Justice Department Guidelines, where the post-merger market would be in a highly-concentrated range (over 1,800), any acquisition which would result in an increase of 50 points in the HHI will raise serious antitrust concerns. *Department of Justice Guidelines* ¶ 3.1.

■ While there may be no fixed numerical threshhold at which an increase in market concentration resulting from a horizontal merger triggers the antitrust laws, *see, e.g., United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), this case does not at the moment appear to be borderline. Assuming the traditional rules of antitrust analysis will continue to apply, the FTC and the Court of Appeals may almost surely be expected to find that the change in market structure following a PPG-Swedlow merger will be sufficiently inimical to competition to forbid the acquisition altogether.[8]

Moreover, largely due to the sophisticated technology which delimits the market initially, the emergence of new producers who could quickly redress anticompetitive conduct resulting from increased concentration in the market, is not foreseeable. Knowledgeable witnesses have estimated that it would take anywhere from two to six years, or more—not counting the cost—to acquire the technological expertise, assemble the trained personnel, and devise the tooling to enter the market as a credible competitor, thereby acknowledging that there are high market entry barriers to exacerbate and prolong the effects of concentration.

Should the PPG-Swedlow merger be allowed to go forward, the reduced competition and increased concentration in the relevant markets will afford a fertile medium for interdependent anticompetitive conduct; more likely, it will precipitate leading firm behavior.[9] Either way, the effects to be anticipated from a PPG-Swedlow merger include a decline in vigorous inter-material research and development, an increase in the price of both glass and acrylic, and an erosion in quality of service. Experience teaches that without worthy rivals ready to exploit lapses in competitive intensity, incentives to develop better products, to keep prices at a minimum, and to provide efficient service over the long term are all diminished to the detriment of consumers.

## II.

■ Because the Commission has made a persuasive showing of its likelihood of success on the merits, some form of interim relief is clearly in order, the question being whether a preliminary injunction or a hold separate order is the more appropriate. The apparent strength of the Com-

---

above 1,800). *Department of Justice Guidelines* ¶ 3.1 (1984).

**8.** PPG and Swedlow may contend before the Commission that current antitrust doctrine as applied to "commodity" markets is inapposite in the context of "customized" products developed primarily for the U.S. Defense Department for which the price to the consumer is the least important aspect of market competition.

**9.** Interdependent anticompetitive conduct is most likely to occur where a market is highly concentrated. The relative lack of competitors eases coordination of actions, explicitly or implicitly, among the remaining few to approximate the performance of a monopolist. *Department of Justice Guidelines* ¶ 1.

A leading firm is one which by itself can exercise market power. Among the dangers to competition is that the leading firm will engage in predatory pricing, the practice whereby it lowers prices until all competitors are driven from the market and then increases prices without fear of being undersold.

mission's case does not preclude the issuance of a hold separate order if the public interest might be better served thereby. *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C.Cir.1981). Comparing the alternative interim remedies, the Court of Appeals has observed,

> a hold separate order, in face of an FTC showing of a likelihood of success, should not issue absent careful review of the particular features of the proposed merger and a reasoned determination from the evidence that the milder restraint will operate as an adequate preservative (impeding interim harm, and safeguarding eventual divestiture) and, in view of the equities entailed, genuinely serve the public interest. When such a determination is fairly made, however, the hold separate order can secure important benefits that a merger-blocking preliminary injunction would sacrifice.

665 F.2d at 1087. *See also FTC v. Pepsi-Co., Inc.*, 477 F.2d 24, 30–31 (2d Cir.1973). In *Weyerhaeuser*, also a horizontal merger case, a divided court of appeals upheld the district court's denial of a preliminary injunction in favor of a hold separate order, holding the lesser restraint to be "consistent with the Congressional design" of section 13(b), 665 F.2d at 1074, and a decision to award it in lieu of a preliminary injunction to reside within the discretion of the district court. *Id.* at 1087. In other words, three criteria determine when a hold separate order might be preferable to an unqualified arrest of the transaction: "(1) strong equities favor consummation of the transaction; (2) a hold separate order will check interim competitive harm; and (3) such an order will permit adequate ultimate relief." *Id.*

 In the instant case, despite the Commission's misgivings, the Court is satisfied that a hold separate relationship—although one considerably more stringent than that proffered by defendants—can be structured to maintain PPG's and Swedlow's *de facto* independence for the duration of the FTC proceedings without compromising the objectives of preliminary relief. (Whether their interest in one another will also survive the necessary estrangement remains to be seen). The remaining issue is, therefore, whether they have shown an equitable entitlement to a temporary reprieve.

Swedlow is perhaps the world's leader in acrylic technology, the primary beneficiary of which of late has been the U.S. military which accounts for some 70 percent of Swedlow's aircraft transparency business. David Swedlow, the company's founder and entrepreneurial muse, however, is nearly 75 years of age and in ill health. No longer able to manage the business himself and having no heir apparent in law or fact to succeed him, Mr. Swedlow wants to sell the business as a going concern to another with both motive to continue it in its present form and resources sufficient to perpetuate its stature in the industry. He would also, of course, like to receive full and fair value for his stock, and to know that others who have invested with him over the years will do likewise.

While several companies have reportedly made inquiries about Swedlow's availability in the recent past (most notably Triplex, whose interest, coincidentally, peaked as it learned of the merger), none has mentioned terms as favorable as those offered by PPG, and other conditions, including financing, are imprecise. There is no assurance given by the evidence that, should the PPG-Swedlow merger fail, any firm, including Triplex, will definitely make an acceptable firm offer for Swedlow. Swedlow could remain, for a time, an attractive acquisition for someone, but for all of the reasons previously noted the number of ready, able, and willing buyers is limited. In short, Swedlow's post-David Swedlow future without a merger with PPG is conjectural even if auspicious.

On the public side of the ledger, should the Court allow the PPG-Swedlow merger to take place subject to a hold separate arrangement (and the arrangement to work as intended), there are at least three significant public benefits to be reckoned: first, availing itself of PPG's considerable finan-

cial resources, Swedlow (at the moment, capital-short) would be able to continue the research and development necessary to preserve its position as a leader in acrylic technology; second, Swedlow could continue for the present as a domestic source of high-tech military transparencies without giving cause for concern over foreign ownership of an important defense resource; and, third, an amalgam (appropriately circumscribed so as to prevent the "leakage" of knowledge the Commission fears) of the technologies of PPG and Swedlow might lead to the development of yet more sophisticated materials and/or transparencies than either could produce alone.

The Commission urges that PPG and Swedlow, believing that they will eventually be one, will have small incentive to continue to compete against one another during the pendency of the FTC proceedings under any form of hold separate order. The Commission submits that the disincentive to compete under hold separate orders is particularly strong in high technology industries in which the large sums of money required for research and development are rarely committed if the parties suspect the results are likely to be duplicative, and only one of them, in any event, may be the successful bidder on any contract offered.

The record at this point, however, is hardly reassuring as to the inevitability of a unitary PPG-Swedlow enterprise. Given the odds at present that the merger ultimately will be permanently disallowed, the uncertainty as to how matters may stand at the conclusion of the case offers considerable inducement to both PPG and Swedlow to keep the latter as viable and attractive to potential third-party purchasers as possible in the event of divestment, if only for PPG to have some reasonable prospect of recouping its substantial investment in Swedlow (assuming, of course, it has not been allowed to spirit away Swedlow's proprietary technology). And, because PPG will be the end beneficiary of Swedlow's profitability in the interim, merger or no, PPG has at least some current incentive to see it thrive, even at PPG's expense.

Nevertheless, to be approved by the Court, any hold separate relationship will necessarily entail, *inter alia:*

1. an express undertaking by PPG and Swedlow to continue to compete in the aircraft transparencies market, and any subdivisions thereof, in the exercise of their respective best business judgments and without regard to the merger agreement, as if they were in all respects separate and independent business entities, with a breach of such undertaking (as well as any other term of the order) to be punishable as a contempt of court;

2. a voting trust of Swedlow stock, with bare beneficial ownership in PPG, the trustee to be Court-appointed and altogether independent of, and unrelated to, any current or prospective participant in the aircraft transparency market here or abroad;

3. an express prohibition of joint commercial activity, or the transfer of any assets (including, but not limited to, non-public financial information and scientific knowledge and technology) between Swedlow and PPG, except in the exercise of the best business judgment of the transferor without regard to the merger agreement, and with the prior permission of the Court, with adequate notice and opportunity to be heard thereon to be given to the Commission; and

4. continued judicial supervision of the relationship.

The Court concludes that a hold separate order containing at least the foregoing conditions will enable Swedlow to remain a viable separate business entity during the pendency of the FTC proceedings which could later be sold if divestiture were ultimately ordered, and complete permanent relief could be implemented with relative ease.

It is, therefore, for the foregoing reasons, this 21st day of February, 1986,

ORDERED, that plaintiff's motion for a preliminary injunction is granted; and it is

FURTHER ORDERED, that within fifteen (15) days the parties may present,

jointly or independently, proposed forms of hold separate orders in accordance with the foregoing; and it is

FURTHER ORDERED, that, after hearing, upon entry of a hold separate order, PPG and Swedlow may be relieved of the injunction to the extent thereof, and may proceed to consummation of so much of the merger agreement as is consistent therewith, subject to any further order of Court.

### ORDER

In accordance with the Memorandum and Order entered herein on February 21, 1986, it is, this 21st day of February, 1986,

ORDERED, that defendants PPG Industries, Inc., and Swedlow, Inc., their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them, are hereby restrained and enjoined from any further performance of the "Agreement and Plan of Merger," dated August 21, 1985, as amended January 9, 1986, pending conclusion of administrative proceedings known as Docket No. 9204 before the Federal Trade Commission or further order of this Court.