**MID–TEX ELECTRIC COOPERATIVE, INC., et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Southwestern Public Service Company, Public Systems, Boston Edison Company, et al., Intervenors.**

**No. 86–1414.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 20, 1987.

Decided June 30, 1987.

As Amended June 30, 1987.

---

Robert A. O'Neil, with whom Wallace F. Tillman and Michael Oldak, Washington, D.C., were on the brief for petitioners. Ted M. Handel, Washington, D.C., also entered an appearance for petitioners.

Joshua Z. Rokach, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief for respondent.

Ben Finkelstein, with whom Thomas N. McHugh, Jr. and Donald Weightman, Washington, D.C., were on the brief for intervenor, Public Systems.

George F. Bruder and Albert R. Simonds, Jr., Washington, D.C., were on the brief for intervenor, Montaup Elec. Co.

Alan J. Statman, Washington, D.C., and Paul J. Kelly, Jr. were on the brief for intervenor, Southwestern Public Service Co.

Before GINSBURG and WILLIAMS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

For the second time, we confront a challenge to a Federal Energy Regulatory Commission (FERC or Commission) rule allowing utilities to include a portion of their construction work-in-progress (CWIP) costs in rate base. A prior panel of this court upheld the first such challenge in part, vacating portions of the rule and remanding the CWIP issue to FERC for further consideration. *Mid-Tex Electric Cooperative, Inc. v. FERC*, 773 F.2d 327 (D.C.Cir. 1985). FERC responded in two measures taken simultaneously: the Commission promulgated an interim rule that, in FERC's own words, "does not change the substance of the general provisions of the [vacated] CWIP rule";[1] looking to the longer term, the Commission requested additional public comments on various CWIP-related matters to assist the Commission in formulating permanent regulations in this area. Petitioners[2] challenge the interim rule on substantive and procedural grounds; they argue that the Commission's interim action is fundamentally inconsistent with this court's directions in the prior *Mid-Tex* case; further, they maintain that FERC's promulgation of the interim rule without public notice and comment violates the relevant Administrative Procedure Act prescriptions.[3] Given the particular circumstances of this case, we reject the peti-

---

1. Order No. 448, Construction Work in Progress—Anticompetitive Implications; Interim Rule And Request For Comment, 51 Fed.Reg. 7774, 7775 (March 6, 1986).

2. Petitioners are the Mid-Tex Electric Cooperative, Inc.; Golden Spread Electric Cooperative, Inc.; Kimwood Electric Cooperative, Inc.; the National Rural Electric Cooperative Association; the American Public Power Association; the Magic Valley Electric Cooperative, Inc.; and the full requirements cooperative customers of Southwestern Public Service Company.

3. 5 U.S.C. § 553 (1982).

tioners' challenges and, accordingly, deny the petitions for review.

## I.

The economic and regulatory framework for the CWIP rulemaking is set forth in detail in our earlier opinion, see Mid-Tex, 773 F.2d at 330–36, and therefore will be described here in abbreviated fashion. Speaking generally, utilities can recover the cost of constructing new generating or transmission facilities in one of two ways. Under the "AFUDC" method,[4] the carrying charges on the capital required to finance new construction—primarily interest on debt and a reasonable return on equity financing—accrue in a separate account that appears as a non-cash asset on the utility's balance sheet. Only when the new facility is operational is the entire cost of construction, including the amount representing accrued carrying charges held in the AFUDC account, added to the utility's rate base; until that time, therefore, the utility does not begin to recover those carrying charges from ratepayers. See Mid-Tex, 773 F.2d at 329–30. Under the CWIP method, by contrast, these carrying charges do not accrue separately; construction costs are added to rate base as they are incurred, and the utility therefore recovers its carrying charges from ratepayers through the return component of its rates, rather than by adding them to the cost of construction for recovery when the plant is in service. The two methods thus differ primarily in the timing of the carrying charges recovery—under CWIP, the utility recovers sooner, under AFUDC, recovery commences later. See generally R. Hahne & G. Aliff, Accounting for Public Utilities §§ 1.04[4]–[5] (1986); Order 298, Construction Work in Progress for Public Utilities (Final Rule), 48 FED.REG. 24323, 24324–26 (June 1, 1983).

In 1983, FERC issued Order 298,[5] which rejected the Commission's then existing policy of authorizing only the AFUDC method of cost recovery[6] in favor of a rule "adopt[ing] a fixed percentage approach that allows any utility to file to include up to 50 per cent of all CWIP in rate base."[7] Order 298 was challenged by petition to this court; in an opinion we will describe in more detail below, the panel that ruled on Order 298 "rejected petitioners' procedural challenges to the Commission's CWIP rulemaking [and] determined that FERC's stated purposes for adopting the rule are valid and that FERC reasonably concluded that the rule would indeed serve those purposes." Mid-Tex, 773 F.2d at 362. However, the Order 298 panel held that FERC had given insufficient consideration to the possible anticompetitive effects of the CWIP rule; the panel therefore vacated certain portions of the rule and remanded the matter back to the Commission. Id.

Some months after the remand, FERC issued Order 448.[8] The Commission promulgated Order 448 as an interim rule, effective immediately upon publication. This new Order temporarily restored many of the features of Order 298; in particular, the Commission announced, inter alia, that utilities could include up to 50% of CWIP in rate base, provided they "address" any anticompetitive objections they "reasonably anticipate that one or more of [their] wholesale customers may raise" and that they

---

**4.** "AFUDC" is an acronym for "Allowance for Funds Used During Construction." See Mid-Tex Electric Cooperative, Inc. v. FERC, 773 F.2d 327, 331 (D.C.Cir.1985).

**5.** Order No. 298, Construction Work in Progress for Public Utilities (Final Rule), 48 FED.REG. 24323 (June 1, 1983).

**6.** Prior to 1983, FERC had created three exceptions to its AFUDC-only policy. CWIP would be allowed for "socially beneficial" investment in either pollution control facilities or conversion

of oil or natural gas generating plants to coal. Order No. 555, 56 F.P.C. 2939 (1976). In addition, FERC permitted a utility to include CWIP in rate base if the utility made a clear and convincing showing that it was experiencing severe financial problems. Id. at 2946.

**7.** Order No. 298, 48 FED.REG. at 24349.

**8.** See supra note 1; just over five months elapsed between issuance of the judgment in the Mid-Tex case (Oct. 5, 1985) and Order No. 448 (Mar. 6, 1986).

"suggest measures to mitigate such objections." [9]

After FERC's promulgation of this interim rule, the petitioners here applied for rehearing before the Commission; simultaneously, they moved before this court for an order directing FERC to comply with the *Mid-Tex* mandate. They were unsuccessful in both fora,[10] and this appeal followed.

## II.

### A. *Order 298 and the* Mid-Tex *remand*

Petitioners' substantive challenge features alleged inconsistencies between Order 448 and the instructions set forth in the prior *Mid-Tex* opinion. FERC's actions, petitioners contend, attempt circumvention of the court-ordered reconsideration of CWIP's anticompetitive effects, and reinstate precisely the regulatory regime overturned by the first *Mid-Tex* court. Evaluating this challenge requires close inspection of both the interim rule itself and the reasons leading the first *Mid-Tex* court to vacate and remand Order 298, the earlier CWIP rule.

The CWIP rule embodied in Order 298, FERC determined, would have three beneficial effects: the rule would (a) mitigate AFUDC's bias against construction of new facilities; (b) allow utilities to assess more accurately the need for new facilities by reducing the tendency, under AFUDC, to overpredict future demand; and (c) advance the goal of price stability by mitigating the sudden price increases under AFUDC. *See Mid-Tex,* 773 F.2d at 332–34; Order 298, 48 FED.REG. at 24323, 24326–39 (June 1, 1983).

The prior *Mid-Tex* panel concluded, after careful review of the rulemaking record and governing precedents, both that FERC possessed the statutory authority to consider these benefits within its overall "public interest" calculus, *see Mid-Tex,* 773 F.2d at 344–47, and that record evidence adequate-ly supported FERC's conclusion that its CWIP rule would achieve the asserted benefits. *See id.* at 347–49, 350–51. The remaining issue was "the extent of FERC's reliance on these [beneficial] considerations at the expense of other criteria which ... FERC is obliged to weigh in the balance." *Id.* at 344. The court found that FERC, when it balanced the probable beneficial and adverse consequences of Order 298, had given insufficient consideration to the CWIP rule's potential for harm; accordingly, the panel ordered FERC to examine that potential more carefully and, if necessary, to recalculate the net benefit of its new rule. *See id.* at 351–62.

The court's prime concern was the prospect that the CWIP rule might have an adverse impact on competition in the electric power industry. The prior *Mid-Tex* opinion featured two significant potential anticompetitive effects: "price squeeze" and "double whammy." Price squeeze, as that term is used here, is a by-product of disparities between state and federal regulation of the utility rate-making process. FERC regulates only sales of electricity for resale, *i.e.,* the "wholesale" rates utilities charge other utilities for power then "retailed" to consumers; those retail rates, in turn, are subject to regulation by the several state power authorities. Many utilities operate in both the wholesale and retail markets, and are thus both suppliers and competitors of their wholesale customers. State regulators may choose not to allow utilities to pass CWIP costs along to their retail customers; where that is the case, *wholesale* prices, if they include some portion of the wholesaler's CWIP costs, may exceed *retail* prices from which CWIP costs are excluded. This "price squeeze" can enable utilities to drive their retail competitors from the retail market by reducing—or eliminating—the profit margin provided by the difference between allowable wholesale and retail prices.

---

**9.** 51 FED.REG. at 7783, amending 35 C.F.R. § 35.26(g)(1).

**10.** The Commission's Order denying the requests for rehearing is reprinted at 51 FED.REG. 22065 (June 18, 1986). The motion for an order directing compliance with the earlier mandate was denied on May 12, 1986. Order, C.A. No. 83–2058 (D.C.Cir. May 12, 1986); *see infra* note 30.

Price squeeze relates to pricing policies with anticompetitive effects in the *retail* power market. Double whammy, on the other hand, refers to one way in which utilities may utilize CWIP to disadvantage competitors in the *wholesale* market. Double whammy "arises when a wholesale customer embarks on a construction program of its own in order to supply itself with all or part of its future power requirement, thereby reducing its dependence on FERC-regulated utilities." *Mid-Tex*, 773 F.2d at 357. If a wholesale supplier is permitted to include CWIP in its rates, such a customer is, in effect, required to help finance facilities unneeded to meet its demand and owned by a utility with which it may be competing at the wholesale level in the future.

In Order 298, FERC acknowledged that allowing utilities to include CWIP in rate base might lead to price squeeze effects. *Id.* at 336; *see* 46 FED.REG. at 23436. However, because the risk of price squeeze "cannot be predic[ted] in advance without having detailed information regarding both wholesale and retail rates and costs[,] ... FERC determined that price squeeze issues relating to CWIP in rate base should be resolved on a case-by-case basis." *Mid-Tex*, 773 F.2d at 336. It was this decision—essentially to ignore the price squeeze issue during *rulemaking* and to consider CWIP-related price squeeze claims only on a case-by-case basis during *ratemaking* proceedings—that we set aside as "prompted by inconsistent rationales." *Id.* at 357; *see also id.* at 351–57.

On the one hand, FERC argued that allowing 50% CWIP in rate base would *generally* not have price squeeze effects, *id.* at 353, 356–57, and that "only a full exploration of the particular facts of each case can determine which of the many disparities between state and federal regulatory practice should be deemed to cause a price squeeze." *Id.* at 352. In combination, these two arguments contain the "necessary implication," *id.* at 353, that FERC would consider, and would remedy, price squeeze claims made in ratemaking proceedings and would thereby "ensure that,

*as applied*, the rule will not operate to create a price squeeze." *Id.*

At the same time, FERC represented that, based on a "general policy ... that federal ratemaking policy ordinarily should not yield to competing state policies," the Commission generally will *not* remedy price squeeze "resulting solely from state regulatory action or inaction, *even on a case-by-case basis.*" *Id.* (emphasis added). This rationale contradicted the first, *see id.*, and we "obviously [could not] affirm a decision based on ... different and inconsistent answers to the same fundamental questions." *Id.*

FERC had three options on remand: (a) it could "show that its CWIP rule will not have any significant price squeeze effects," *id.* at 357; (b) it could more fully "explain the basis, in law and policy," *id.*, for its asserted policy of ignoring price squeeze caused by state-federal regulatory disparities, or (c) if neither (a) nor (b) proved sufficient—*i.e.*, if FERC concluded that it is indeed obliged to consider those price squeeze effects at the rulemaking stage—then the Commission "must explain what importance is being assigned to those [price squeeze] effects in comparison to the importance of the public interest goals on which ... FERC may validly rely as general support for allowing CWIP in rate base." *Id.*

Order 298 had also recognized the potential "double whammy" consequences of allowing CWIP in rate base. *See id.* at 357. In response to this matter, the Commission stated that it would "allow wholesale customers to escape liability for CWIP if they can prove that they bear no responsibility for the decision to build a new plant and will, in fact, purchase no ... power [from] the new plant." *Id.* at 358, quoting 48 FED.REG. at 46014. FERC's decision to consider double whammy in this particular fashion was "essentially a reprise of its decision to consider price squeeze issues only on a case-by-case basis," *id.*, and was similarly infirm; lacking any explanation for FERC's refusal to consider double whammy as an integral part of its rulemak-

ing process,[11] or any estimate of the scope of the double whammy problem, *id.*, the court ordered FERC to reconsider.

Additionally, the first *Mid-Tex* court directed FERC to address on remand three subsidiary issues. First, FERC must supply a "reasoned basis," *id.*, for placing the burden on the *customers* to demonstrate that the *utility's* decision to build a new generating facility was not one for which they bore any "responsibility." *Id.*[12] Second, FERC would have to justify its treatment of a customer's CWIP liability as an "all-or-nothing" matter, with no opportunity for a customer to avoid *some* CWIP liability by showing that its power requirements played a proportionately smaller role in the utility's decision to build a new facility than its share of the utility's current output would suggest. *Id.* at 359. Finally, the court ordered FERC to clarify its position on a utility's "obligation to serve" its wholesale customers if it chose to rely, as it apparently had in Order 298, on that obligation in resolving the double whammy issue. *Id.*

### B. *Order 448*

In Order 448, FERC requested additional comments on a number of questions concerning the anticompetitive effects of its CWIP policy[13] to aid in its "reevaluation of the complex issues raised [for the Commission's consideration] on remand by the *Mid-Tex* court,"[14] and in its preparation of a final rule in this area. At the same time, FERC indicated that it did not intend to "revisit the fundamental policy issues un-

derlying the decision to permit some CWIP in rate base."[15] In FERC's view, the "thrust of the [first *Mid-Tex*] court's concern, while significant, was relatively narrow";[16] the court "accepted major portions of the Commission's rationale for adopting its prior CWIP rule,"[17] and the Commission advanced its "tentative opinion that if adequate procedures can be developed to handle individual instances of CWIP-related price squeeze and double whammy, the balance will continue to tip in favor of a rule permitting utilities to file rates which include CWIP in rate base."[18]

The Commission's interpretation of the prior *Mid-Tex* opinion thus informed its view of the scope of the rule-making proceeding ahead. In addition, FERC's reading of the court's opinion led the Commission to conclude that it was not required to reinstate the AFUDC-only policy in effect prior to the advent of Order 298 while it reconsidered the CWIP issue. The interim rule promulgated in Order 448, FERC candidly admits, "in large measure repromulgat[es] the rule addressed by the [prior] *Mid-Tex* [panel]" and "does not change the substance of the general provisions of the Commission's former CWIP rule under which public utilities could seek to include [50% of CWIP] in rate base."[19] The interim rule differed from the rule vacated by the first *Mid-Tex* court in the following ways:

    (a) Notwithstanding its "past reluctance to remedy a price squeeze based solely on differences in isolated regula-

---

**11.** *See Mid-Tex,* 773 F.2d at 358 ("FERC offered no explanation for its refusal to consider 'double whammy' as an objection to its CWIP policy rather than as a defense to its application.").

**12.** The panel also commented on the apparent ambiguity surrounding this notion of "responsibility":

    FERC [did not] offer even a hint as to what kind of "responsibility" is decisive. Does FERC mean to focus on the subjective decision-making of the utility's managers or rather reconstruct an "objective" decision on the basis of the data concerning customer load growth that was available to the utility? These ... questions must be resolved before a reviewing court can say whether or not

    FERC's "double whammy" doctrine is rational.
    *Mid-Tex,* 773 F.2d at 359.

**13.** *See* 51 Fed.Reg. at 7779–81.

**14.** *Id.* at 7777.

**15.** *Id.* at 7775.

**16.** *Id.* at 7777.

**17.** *Id.*

**18.** *Id.* at 7775.

**19.** *Id.*

tory practices," [20] the Commission indicated that at least during this interim period it "will attempt to identify such [regulatory] price squeezes in individual cases and to provide effective relief where warranted." [21]

(b) Rate applicants who "should reasonably anticipate CWIP-related price squeeze or double whammy objections by one or more of [their] customers [must] address these matters in [their] filing and ... suggest measures to mitigate such concerns." [22]

(c) With respect to double whammy, the Commission shifted the burden of proof onto rate applicants to "provide a positive demonstration that the wholesale customers' demands were a significant factor in the utility's decision to build the facilities for which such CWIP is requested." [23]

(d) If a wholesale customer makes a "concrete, substantial showing that it is likely to incur imminent, irreparable harm if such CWIP is allowed, the Commission may consider preliminary relief," [24] such as suspending the rate increase for up to five months [25] or ordering that CWIP payments be postponed until after issuance of a final order on rehearing.[26] The Commission emphasized, however, that this relief will be available only in *"extraordinary* circumstances"; [27] in the ordinary case, CWIP charges will be collected subject to the Commission's power to order refunds af-

ter a final ruling in the ratemaking proceeding.

### III.

Petitioners attack FERC's interim action on two fronts. Order 448, they assert, is not responsive—indeed, is directly contrary—to the instructions of the prior *Mid-Tex* panel. The interim rule, petitioners contend, "does not even purport to resolve the substantive deficiencies noted by the Court in *Mid-Tex*," [28] and the Commission has neither "establish [ed] that the reinstituted CWIP rule will not cause anticompetitive injury to wholesale electric customers [nor] address [ed] issues that [the first *Mid-Tex* court] held must be addressed as a condition precedent to reinstituting the CWIP policies adopted in [Order 298]." [29] Petitioners challenge additionally the absence of public notice and comment prior to the promulgation of Order 448; this omission, petitioners maintain, violates the rulemaking prescriptions of the Administrative Procedure Act. We address each of these two contentions in turn.

### A. *The Interim Rule and the* Mid-Tex *Mandate*

This proceeding, although formally styled a petition for review of FERC's Order 448, is essentially a proceeding to enforce or clarify the mandate of the first *Mid-Tex* panel.[30] Necessarily, we have authority to direct a party to an adjudication to desist from "do[ing] anything which is

20. *Id.* at 7778; *see also Mid-Tex,* 773 F.2d at 352–53.

21. 51 FED.REG. at 7778.

22. *Id.*

23. *Id.*

24. *Id.; see also infra* note 37.

25. FERC's suspension powers are exercised under the authority granted in section 205(e) of the Federal Power Act, 16 U.S.C. § 824d(e) (1982). *See* Southwestern Electric Power Company v. FERC, No. 86–1104 (D.C.Cir. Feb. 3, 1987).

26. 51 FED.REG. at 7778.

27. *Id.* (emphasis in original).

28. Brief for Petitioners at 11.

29. *Id.* at 15.

30. Our consideration of FERC's compliance with the prior *Mid-Tex* mandate is not foreclosed by the earlier denial of petitioners' motion for an order directing compliance with that mandate. *See supra* note 10. FERC, in opposition to the motion, argued that the court should defer ruling on it until petitioners had exhausted their administrative remedies, *i.e.,* their request for rehearing then before the Commission. The court's order denying the motion issued without comment or explanation, thereby raising no necessary implication that the court reached the merits of petitioners' challenge.

contrary to either the letter or spirit of the mandate construed in the light of the opinion of [the] court deciding the case." *City of Cleveland v. FPC,* 561 F.2d 344, 346 (D.C.Cir.1977), quoting *Yablonski v. UMW,* 454 F.2d 1036, 1038 (D.C.Cir.1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972); *accord ILGWU v. Donovan,* 733 F.2d 920, 921–23 (D.C.Cir.1984); *Action on Smoking and Health v. CAB,* 713 F.2d 795 (D.C.Cir.1983); *American Trucking Associations, Inc. v. ICC,* 669 F.2d 957, 959–61 (5th Cir.1982). We thus turn to the opinion of the first *Mid-Tex* panel to ascertain the "letter and spirit" of the mandate under which FERC labored.

■ No instant enlightenment is produced upon viewing the decision, for the opinion leaves unaddressed the issue now critical—FERC's interim authority to retain a CWIP rule while the Commission undertakes the court-ordered thorough reconsideration of CWIP's anticompetitive consequences. Our mandate to FERC was clear on what was expected of FERC at the end of the line, *i.e.,* on the standards against which any *permanent* CWIP rules would be measured,[31] and FERC structured its reopened notice-and-comment process with an eye toward those standards. *See* Order 448, 51 FED.REG. at 7779–81. Any "interim mandate," however, may be derived only by implication from the prior *Mid-Tex* opinion. In light of the earlier panel's concerns with CWIP's anticompetitive consequences, we conclude that the Commission reasonably could infer the following permission: should it become necessary or proper to provide a regulation prior to completing its full reconsideration of the CWIP issue, FERC may do so *if* it takes steps reasonably calculated to protect customers from the anticompetitive effects, *i.e.,* price squeeze and double whammy, whose poten-

tial significance the prior panel considered substantial enough to call the entire CWIP policy into question.

This, we hold, FERC has done. Reserving the procedural question for later discussion, *i.e.,* whether FERC had "good cause" to proceed without public notice-and-comment during this interim period,[32] we find that the Commission has not been faithless to the letter or spirit of the prior *Mid-Tex* decision. We disagree with petitioners' contention that in this case the Commission has "effectively stay [ed] the [first] *Mid-Tex* mandate," Brief for Petitioners at 25, by means of its interim regulation, leaving wholesale customers in the same position they were in under the vacated rule. *See ILGWU,* 733 F.2d at 922–23 (Secretary of Labor's attempt to "reimplement[ ] precisely the same rule that this court vacated as 'arbitrary and capricious' " conflicts with "interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded").

FERC took several steps to insure that the "interim procedures [established by Order 448] guard against potential harm from CWIP-related price squeeze and/or double whammy during the pendency of the Commission's full review of the concerns expressed by the [first] *Mid-Tex* court." [33] First—and most significantly—FERC has signaled its intention to "provide effective relief" in cases where double whammy and price squeeze effects are shown; notably, FERC has abandoned, at least during this interim period, its policy of leaving "regulatory" price squeezes unremedied.[34] We take FERC at its word in this regard, and stand ready, should a proper case be presented, to insure that effective relief is indeed provided. FERC's requirement that utilities including CWIP in their rate filings address all price squeeze and double wham-

---

**31.** FERC concedes that the actions taken in Order 448 could not withstand scrutiny if measured against these standards. *See* Order 448, 51 FED.REG. at 7775 ("it is apparent that the Commission must give further consideration to issues involving potential anticompetitive concerns, specifically price squeeze and double whammy"); Order Denying Requests for Rehearing, 51 FED.REG. at 22065 n. 9 ("In Order No. 448, the Commission did not seek to respond

definitively to the specific questions raised by the *Mid-Tex* court.").

**32.** *See infra* Section III(B).

**33.** Order Denying Requests for Rehearing, 51 FED.REG. at 22065.

**34.** *See supra* text at notes 20–21.

my objections they should "reasonably anticipate," and suggest mitigating measures,[35] should assist the Commission in providing relief when needed. The likelihood of injury from double whammy should be reduced still further by the requirement that rate applicants provide "a positive demonstration that the customer's demand was a significant factor in the utility's decision to build the facilities included as ... CWIP, or other justification for assessing against the customer the particular share of construction costs." [36]

We are cognizant that ratemaking procedures may continue for several years, so that allowing CWIP subject to possible refund at the close of a ratemaking may involve substantial financial hardship for customers. But here again, we note that the Commission has signaled its willingness to exercise its suspension powers and provide preliminary relief where a wholesale customer can make a "concrete, substantial showing that it is likely to incur imminent, irreparable harm if CWIP is allowed." [37]

We do not confront allegations that these protections are not being *applied* in a manner consistent with our concerns as expressed in the prior *Mid-Tex* opinion, and nothing we say here should be interpreted to foreclose a party from raising such a claim in the future. We hold only that FERC has put into place safeguards adequate, at least on their face, to protect customers against the kinds of injuries its CWIP policy may cause,[38] injuries FERC did not—and has not—convinced us can safely be ignored.

We examine, finally, petitioners' objection that Order 448 is infirm because it was promulgated without notice and comment.

### B. *"Good Cause" for Omitting Notice and Comment*

The Administrative Procedure Act permits rulemaking without public notice and comment when an agency "for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B) (1982). FERC emphasized three factors which, in its judgment, combined to establish "good cause" for omitting notice and comment procedures in promulgating Order 448. First, the Commission stressed both the *interim* nature of Order 448, and the ongoing public procedures designed to assist FERC in formulating a permanent CWIP policy. Second, FERC observed that the "fundamental approach to including CWIP in rate base [was] supported by a broad and substantial record" and had been approved "in substantial measure" by the first *Mid-Tex*

---

**35.** *See supra* text at note 22.

**36.** *See supra* text at note 23.

**37.** 51 Fed.Reg. at 7783. In Order 448, the Commission noted merely that it *"may* consider preliminary relief at the suspension order stage," *id.* (emphasis added), where a wholesale customer made a proper showing of immediate, irreparable harm. Subsequently, the Commission "clarifie[d] that it *will* consider" such relief, Order Denying Requests for Rehearing, 51 Fed. Reg. at 22066 n. 19 (emphasis in original), explaining that its initial choice of the permissive verb was "only intended to indicate that any remedy that might be considered would, of necessity, depend on the factual circumstances present." *Id.*

**38.** The problem FERC faced during this interim period can be analogized to the one we confronted in *FTC v. Weyerhauser Co.,* 665 F.2d 1072 (D.C.Cir.1981). The issue in that case was the allowable scope of the district court's discretion to fashion relief *pendente lite* based upon the FTC's demonstration that it was likely to succeed in invalidating a proposed merger on antitrust grounds. Notwithstanding that demonstration, the district court refused to enjoin the merger as requested by the FTC, issuing instead a "hold separate" order that "permits the challenged transaction to go forward, but requires the acquiring company to preserve the acquired company ... as a separate and independent entity during the course. of antitrust proceedings." *Id.* at 1075 n. 7. Such an order should not issue, we held, unless "significant equities favor the transaction and the less drastic restraint of a hold separate order realistically can be expected (a) to safeguard adequate eventual relief if the merger is ultimately found unlawful, and (b) to check interim anticompetitive harm." *Id.* at 1085. Similarly, as noted in the text, the procedures put in place by Order 448 adequately "check interim anti-competitive harm"; as to their ability to "safeguard adequate eventual relief" if the CWIP policy is subsequently abandoned, *see infra* pp. 1133–1134.

court.[39] Third, FERC referred to the "considerable reliance" utilities placed upon the Commission's CWIP rule during the period between the June 1983 promulgation of Order 298 and the October 1985 *Mid-Tex* judgment;[40] to "delay readoption of any generic rule or policy until completion of all notice and comment procedures," FERC maintained, would be "contrary to the public interest in having a clear and identifiable CWIP rule"[41] and could produce "irremedial financial consequences and regulatory confusion."[42]

■ We are satisfied that FERC has established the requisite "good cause," although we recognize that petitioners have raised a substantial and troublesome question. This court has cautioned that the § 553(b)(3)(B) exception should be "narrowly construed and reluctantly countenanced." *American Federation of Government Employees v. Block*, 655 F.2d 1153, 1156 (D.C.Cir.1981). *Accord Action on Smoking and Health v. CAB*, 713 F.2d 795, 800 (D.C.Cir.1983); *National Federation of Federal Employees v. Devine*, 671 F.2d 607, 611 (D.C.Cir.1982); *Council of the Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 580–81 (D.C.Cir.1981). That admonition means our inquiry should be a close one. We comprehend, however, that the "good cause" inquiry is inevitably fact- or context-dependent. Viewed in their entirety, the justifications proffered here by FERC, we hold, are sufficiently weighty to support the Commission's decision to declare its interim rule, Order 448, effective immediately upon publication.

The interim status of the challenged rule is a significant factor in our determination. Our precedents establish that the "limited nature of the rule cannot in itself justify a failure to follow notice and comment procedures." *Council of Southern Mountains*, 653 F.2d at 582; *see also AFGE*, 655 F.2d at 1157–59 (citing cases holding "even interim regulations invalid without public procedures"). But public notice and comment, we have also said, gain in importance "the more expansive the regulatory reach of [agency] rules," *AFGE*, 655 F.2d at 1156; thus, we have consistently recognized that a rule's temporally limited scope is among the key considerations in evaluating an agency's "good cause" claim. *See Council of Southern Mountains*, 653 F.2d at 582; *NFFE*, 671 F.2d at 612; *cf. AFGE*, 655 F.2d at 1157–58 (while upholding Agriculture Department's "emergency regulations" promulgated in response to prior court injunction, court finds no justification "for the issuance of *permanent* regulations" absent public notice-and-comment procedures).

We recognize that court tolerance of "temporary" measures installed without a public airing may give the agency an apparent incentive to proceed with its permanent rulemaking at a leisurely pace; we emphasize, therefore, that the agency must convince us, as FERC has done here,[43] that it is not engaging in dilatory tactics during the interim period. *See Council for Southern Mountains*, 653 F.2d at 582 (agency's assurances that regulations would be implemented shortly "conribute[d] substantially to [court's] impression" that agency was acting in good faith, absent which court "could not excuse [agency's earlier] decision to defer implementation without affording interested parties prior notice or an opportunity to comment"); *NFFE*, 671 F.2d at 613 (court conditioned finding of validity of interim regulations "on expeditious conduct of notice and comment procedures in good faith").

Similarly, while none of the other factors FERC pressed would constitute "good

---

**39.** Order Denying Requests for Rehearing, 51 FED.REG. at 22067.

**40.** *Id.*

**41.** Order 448, 51 FED.REG. at 7781.

**42.** Order Denying Requests for Rehearing, 51 FED.REG. at 22067.

**43.** At the March 20, 1987 oral argument in this case, FERC's counsel referred to an internal scheduling document that FERC had prepared for the Office of Management and Budget showing May 1987 as the time scheduled for final action on a permanent CWIP regulation. By letter, counsel subsequently informed us that the Commission issued Order 474, its final CWIP rule, on June 18, 1987.

cause" standing alone, the combined effect of the cited considerations leads us to accept FERC's conclusion that delaying its interim rule would be contrary to the public interest. FERC's CWIP policy was originally adopted after a lengthy period of public comment,[44] and the prior *Mid-Tex* panel sustained, in large measure, FERC's contention that CWIP would yield substantial benefits to the public. *See Mid-Tex*, 773 F.2d at 344–51. We do not suggest that the previously-compiled record, however elaborate, adequately substitutes in this case for a new round of public comments. *See Action on Smoking and Health*, 713 F.2d at 800–01 (new round of comments required where record was two-to-four years old and likelihood of new information was large). Nor do we intimate that the potential anticompetitive consequences of CWIP occasion no serious concern. As we indicated earlier,[45] however, we are satisfied that the Commission's interim procedures are adequate, as a temporary measure, to afford some protection against those consequences and that they strike a reasonable balance, fairly accommodating the interests of all affected parties, while the Commission considers a permanent solution to the CWIP question.

Finally, we credit FERC's context-specific concerns regarding "regulatory confusion" and "irremedial financial consequences." The need for regulatory guidance is evident here, for a fundamental rationale underlying the CWIP policy is to foster more efficient and rational *long-range* capital investment decisions. *See Mid-Tex*, 773 F.2d at 332–34; Order 298, 48 FED.REG. at 24325–29. FERC's CWIP policy was in place for over two years prior to the issuance of the remand order by the first *Mid-Tex* panel, and the Commission has expressed its intention *not* to revisit, during its current rulemaking, the "funda-

mental policy issues underlying the decision to permit some CWIP in rate base." [46] Moreover, the Commission has announced its "tentative opinion" that "if adequate procedures can be developed to handle individual instances of CWIP-related price squeeze and double whammy, the balance will continue to tip in favor of a rule permitting utilities to file rates which include CWIP in rate base." [47] While we have no basis in the current record to opine on the likelihood that FERC will devise "adequate procedures," we think it plain that the interim rule potentially promotes a prime regulatory interest in continuity of rate-making policy. If FERC succeeds in implementing a permanent CWIP policy purged of the anticompetitive features that concerned the earlier *Mid-Tex* panel, the interim rule now under inspection will have allowed the realization of the benefits of this policy on a more-or-less continuous basis since June 1983.

FERC may be unsuccessful in that endeavor, we acknowledge, in which case the continuity interest would not be served by upholding the interim rule. FERC argues nonetheless that the balance of hardships tips in favor of an interim CWIP policy in view of the "irremedial financial consequences" of further delay. Petitioners strongly dispute this claim. They assert that the "utility industry has moved from a period of cash shortage to a period of cash excess [so that] it is very unlikely that utilities will suffer economic[ally] from a delay in implementing a new CWIP rule." [48] But FERC may properly concern itself with "financial consequences" that are not reflected in the utilities' balance sheets. It is true that, in concluding that its original CWIP policy was in the public interest, FERC assigned *"some* weight to the recent financial problems many utilities have experienced." *Mid-Tex*, 773 F.2d at

---

44. The notice-and-comment period preceding promulgation of Order 298 lasted six months, during which time the Commission received comments from several hundred individuals and organizations. *See* 48 FED.REG. at 24332. The record in that proceeding has been incorporated by reference in the Commission's ongoing permanent rulemaking proceeding. *See* 51 FED. REG. at 7782.

45. *See supra* Section III(A).

46. Order 448, 51 FED.REG. at 7775.

47. *Id.*

48. Brief for Petitioners at 33.

334 (emphasis added). The Commission placed far greater weight, however, on CWIP's promotion of "a regulatory framework within which utilities can make an unbiased assessment of the need for new capacity and of the best means of meeting that end." *Id.* at 347. The consequences of delay, then, include "skew[ed] ... decisionmaking," *id.* at 345, leading to either over- or under-investment in new generating facilities. *See id.* This is not the kind of harm that the Commission's statutory powers enable it to remedy with ease.

By contrast, the harm to wholesale customers under a CWIP regime, if that regime is later abandoned, is securely within the Commission's remedial powers; all CWIP charges are being collected subject to the Commission's powers to order refunds of the amounts so collected (plus interest). *See* 16 U.S.C. § 824d(e) (1982). We have, albeit in a somewhat different context, rejected the claim that allowing utilities to collect payments subject to refund subjects customers to irreparable injury. *See Papago Tribal Utility Authority v. FERC*, 628 F.2d 235, 240–41 (D.C.Cir. 1980) (noting that Congress specifically devised the refund provisions of the Federal Power Act to protect customers from the interlocutory consequences of unjust or unreasonable rate increases). The reasoning in *Papago* is applicable here. Putting aside the possible anticompetitive harms that may result from a CWIP policy, with which we believe FERC has dealt adequately on a temporary basis, we think FERC justifiably discounted the financial harm to wholesale customers, *i.e.*, the higher rates those customers would be paying under the interim rule, in light of the statutory prescriptions designed to arm FERC with power to remedy "overcharges" collected by the utilities.

CONCLUSION

For the reasons stated, the petitions for review are denied and the challenged Commission orders are affirmed.

*It is so ordered.*